FF#1300
CLTIC GF #0000 88 SDT
CSM-KRC

## WARRANTY DEED WITH VENDOR'S LIEN

934838

**Date:** March 10, 2000 to be effective March 13, 2000    Deed   03/22/00   2044161   $13.00

**Grantor:**    William C. McClelland and wife, Anthea McClelland

**Grantor's Mailing Address (including county):**

P.M.B. 378
660 Preston Forest Center
Dallas, TX 75230
Dallas       County

**Grantee:**    James Dudley Judd, Jr. and James W. Morris

**Grantee's Mailing Address (including county):**

James Dudley Judd, Jr.
4115 LaPlace Drive
Dallas, Texas 75220
Dallas County

James W. Morris
4115 LaPlace Drive
Dallas, Texas 75220
Dallas County

**Consideration:**    TEN AND NO/100 DOLLARS and other good and valuable consideration and the further consideration of two notes of even date, executed by Grantee, which will be described in this paragraph and referred to as the first-lien note and second-lien note. Payment of both notes is secured in part by the vendor's liens retained in this deed. The first-lien note is in the principal amount of ONE HUNDRED SEVENTY ONE THOUSAND FIVE HUNDRED & NO/100 ($ 171,500.00 ), payable to the order of World Savings Bank, A Federal Savings Bank in consideration of said World Savings Bank, A Federal Savings Bank having advanced funds to Grantor for the full amount of the note. It is secured by first, prior, and superior vendor's liens on the property and by a first-lien deed of trust of even date, from Grantee to Gary Bradley, Trustee. The second-lien note is in the principal amount of THIRTY SIX THOUSAND SEVEN HUNDRED FIFTY & NO/100 ($ 36,750.00 ), payable to the order of Compass Bank in consideration of said Compass Bank having advanced funds to Grantor for the full amount of the note. The second-lien note is secured by second, subordinate, and inferior vendor's liens on the property and by a second-lien deed of trust of even date, from Grantee to Eugene F. Weimer, Trustee, Trustee.

The first vendor's lien and superior title retained in this deed secure payment of the first-lien note and they are transferred to World Savings Bank, A Federal Savings Bank without recourse on Grantor. The second vendor's lien and superior title secure payment of the second-lien note, and

Warranty Deed with Vendor's Lien Page 1 of 3

200057 05081



PLAINTIFF'S EXHIBIT
A

they are transferred to Compass Bank without recourse on Grantor. All liens securing payment of the second-lien note are second, subordinate, and inferior to the first-lien note, to any renewals and extensions of the first-lien note, and to all liens securing payment of the first-lien note. If Grantee defaults in the payment of the first-lien note or in observance of any covenant or condition of any instrument securing its payment, Compass Bank shall have the right to foreclose the second vendor's lien.

**Property (including any improvements):**

Lot 4, Block B/5084, of SECTION TWO, FRENCHMAN'S CREEK ADDITION, an addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 80203, Page 579, of the Map Records of Dallas County, Texas.

**Reservations From and Exceptions to Conveyance and Warranty:**

None

Grantor, for the consideration, receipt of which is acknowledged, and subject to the reservations from and exceptions to conveyance and warranty, grants, sells and conveys to Grantee the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, successors and heirs, executors, administrators, successors and assigns to warrant and forever defend all and singular the property to Grantee and Grantee's claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

The vendor's lien against and superior title to the property are retained until each note described is fully paid according to its terms, at which time this deed shall become absolute.

When the context requires, singular nouns and pronouns include the plural.

William C. McClelland by Anthea McClelland

William C. McClelland , ACTING HEREIN BY AND
THROUGH HIS DULY AUTHORIZED AGENT AND ATTORNEY IN
FACT, ANTHEA MCCLELLAND

Anthea McClelland
Anthea McClelland

Warranty Deed with Vendor's Lien Page 2 of 3

200057 05085

**ACKNOWLEDGMENT**

STATE OF TEXAS

COUNTY OF COLLIN

§
§
§

This instrument was acknowledged before me on <u>March 10,</u>     , 2000, by William C. McClelland., acting herein by and through his duly authorized Agent and Attorney-in-Fact, Anthia McClelland.



Carolyn Sue Murski
Notary Public, State of Texas
My Comm Expires 11/26/00

_____
Notary Public, State of Texas

**ACKNOWLEDGMENT**

STATE OF TEXAS

COUNTY OF COLLIN

§
§
§

This instrument was acknowledged before me on <u>Mar. 10, 2000,</u> by Anthea McClelland.

Carolyn Sue Murski
Notary Public, State of Texas
My Comm Expires 11/26/00

_____
Notary Public, State of Texas

AFTER RECORDING RETURN TO:

James Dudley Judd, Jr
James W. Morris
4115 LaPlace Drive
Dallas, Texas 75220

Warranty Deed with Vendor's Lien Page 3 of 3

2000057 05087

FILED

2000 MAR 22 PM 3:04

EARL BULLOCK
COUNTY CLERK
DALLAS COUNTY

Any provision herein which restricts the sale, rental, or use of the described real property because of color or race is invalid and unenforceable under federal law.
STATE OF TEXAS COUNTY OF DALLAS
I hereby certify this instrument was filed on the date and time stamped hereon by me and was duly recorded in the volume and page of the named records of Dallas County, Texas as stamped hereon by me.

MAR 22 2000

Earl Bullock
COUNTY CLERK, Dallas County, Texas

6672530

*0210000435576700005212TSVS0380*

# EQUITY OPTIMIZER CREDIT AGREEMENT AND DISCLOSURE

| Principal $126,000.00 | Loan Date 07-24-2008 | Maturity 07-24-2041 | Loan No *** | Call / Coll R63 | Account | Officer 22275 | Initials |
|---|---|---|---|---|---|---|---|
| References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations. | | | | | | | |

**Borrower:**  JAMES JUDD
4115 LA PLACE DR
DALLAS, TX 75220

**Lender:**  Compass Bank
DALLAS PRESTON CENTER
8071 SHERRY LANE
DALLAS, TX 75225
9727059601

## CREDIT LIMIT: $126,000.00

**DATE OF AGREEMENT:** July 24, 200

**Introduction.** This Equity Optimizer Credit Agreement and Disclosure ("Agreement") governs your line of credit (the "Credit Line" or the "Cred Line Account") issued through Compass Bank. In this Agreement, the words "Borrower", "you," "your," and "Applicant" mean each and ever person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean Compass Bank You agree to the following terms and conditions:

**Promise to Pay.** You promise to pay Compass Bank, or order, the total of all credit advances and FINANCE CHARGES, together with all cos and expenses for which you are responsible under the "Deed of Trust" described below. You will p your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on th Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to or us Borrower. Each Borrower authorizes any other Borrower to cancel the Credit Line, to request and receive credit advances, and to do all oth things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and th others will remain responsible.

**Home Equity Line of Credit.** This Credit Line Account is an extension of credit of the type defined by Sections 50(a)(6) and 50(t), Article XV Texas Constitution and is made at an agreed rate authorized by applicable law. Notwithstanding any provision in this Agreement in any oth document, this Credit Line Account is not secured by any collateral in addition to your homestead.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue as follows: throughout th Draw Period and Repayment Period described below. All indebtedness under this Agreement, if not already paid pursuant to the paymer provisions below, will be due and payable at the end of this term. The draw period of your Credit Line will begin on a date, after the Openin Date, when the Agreement is accepted by us in the State of Texas, following the expiration of the right to cancel, the perfection of the Deed o Trust, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: fo one year from the date of this Agreement, renewable annually at our option for up to twenty (20) years. In the event we choose not to renew this Agreement, we will give you notice in writing of that decision. You may obtain credit advances during this period ("Draw Period"). Aft the Draw Period ends, the repayment period will begin and you will no longer be able to obtain credit advances. The length of the repaymer period is as follows: either ten (10) or fifteen (15) years, depending on your outstanding balance at the end of the Draw Period, as describe below. To the extent permitted by applicable law, you agree that we may renew or extend the period during which you may obtain cred advances or make payments, and you further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** During the Draw Period, your "Regular Payment" will equal the amount of your accrued FINANCE CHARGES or $75.0 whichever is greater ("First Payment Stream"). You will make 12 of these payments. Your payments will be due monthly. An increase in th ANNUAL PERCENTAGE RATE may increase the amount of your Regular Payment.

Following the Draw Period, your "Regular Payment" will be based on your outstanding balance as shown below ("Second Payment Stream" Your payments will be due monthly.

| Range of Balances | Number of Payments | Amortization Period |
|---|---|---|
| $19,999.99 and Under | 120 | 120 payments |
| $20,000.00 and Above | 180 | 180 payments |

Your "Minimum Payment" both during and after the Draw Period, will be the Regular Payment, plus any amount past due and all other charges.

A change in the ANNUAL PERCENTAGE RATE can cause the balance to be repaid more quickly or more slowly. When rates decrease, les interest is due, so more of the payment repays the principal balance. When rates increase, more interest is due, so less of the payment repay the principal balance. If this happens, we may adjust your payment as follows: your final payment may be increased. Each time the ANNUA PERCENTAGE RATE increases, we will review the effect the increase has on your Credit Line Account to see if your payment is sufficient to repa the interest due. If it is not, your payment may be increased by an amount necessary to repay the balance at the new ANNUAL PERCENTAG RATE, within the original amortization period. You agree to pay not less than the Minimum Payment on or before the due date indicated on you periodic billing statement.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied to amount due under this Agreement in any order that we choose, including the allocation of payments to balances on advances with lower interest rate regardless of the order in which those advances were posted to your Credit Line.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or othe instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments receive at that address on any business day will be credited to your Credit Line as of the date received.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of One Hundred Twenty-six Thousand & 00/100 Dollar ($126,000.00), which will be your "Credit Limit" under this Agreement. You acknowledge and agree that your Credit Limit is less than or equ to fifty percent (50%) of your homestead's fair market value. Further, you acknowledge and agree that the sum of the Credit Limit, plus th outstanding principal balances on all debts secured by your homestead is less than or equal to eighty percent (80%) of the fair market value o your homestead. During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. Yo may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Cred Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance tha will make your Credit Line Account balance exceed your Credit Limit. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds you Line Account. If you exceed your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Deed of Trus covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreemen the Deed of Trust or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required fo continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Deed of Trust for this transaction We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your dwelling These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your dwelling. If you do not pay you property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a cred advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credi advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follow

**Credit Line Checks.** Writing a preprinted "Convenience Line Check" that we will supply to you.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Convenience Line Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Convenience Line Check


PLAINTIFF'S EXHIBIT
B

check is returned or not paid, we are not responsible.

**Stolen Checks.** Your Convenience Line Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Convenience Line Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Convenience Line Check.

**Transaction Violation.** Your Convenience Line Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Convenience Line Check.

If we pay any Convenience Line Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Convenience Line Check. The Convenience Line Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Convenience Line Checks along with your periodic statement as a credit advance. We do not "certify" Convenience Line Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line Convenience Line Check Limitations.** The following transaction limitations will apply to your Credit Line and the writing of Convenience Line Checks.

**Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $4,000.00. This means any Convenience Line Check must be written for at least the minimum advance amount.

**Authorized Signers.** The words "Authorized Signer" on Convenience Line Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Convenience Line Checks.** If you lose your Convenience Line Checks or if someone is using them without your permission, you must notify us immediately. The fastest way to notify us is by calling us at (800) 239-5175. You also can notify us at Compass Bank Card Center P. O. Box 2210, Decatur, AL 35699-0001.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Homestead Lien Contract and Deed of Trust dated July 24, 2006, to a trustee in favor of us on real property located in Dallas County, State of Texas.

**PROPERTY INSURANCE.  FIRE AND EXTENDED COVERAGE INSURANCE** against loss of or damage to the property to its full insurable value or to the extent of all indebtedness under this Agreement, whichever is less, IS REQUIRED for the full term of this Agreement, and YOU MAY OBTAIN SUCH INSURANCE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS OR IN THE STATE WHERE THE PROPERTY IS LOCATED, IF OTHER THAN TEXAS.  YOU MAY ALSO PROVIDE THE SAME BY ASSIGNMENT OF EXISTING EQUIVALENT COVERAGE. If you fail to maintain such insurance for any reason, we may buy similar insurance protecting our interest in the property, and you will repay us the premium for such insurance, together with interest thereon as provided in this Agreement at the prematurity rate. Any Post Maturity Rate shall not be applicable to amounts paid by us for insurance premiums. We will inform you of the addition of this amount to the unpaid balance and of your new payment schedule reflecting that addition. If such insurance is sold for a premium not fixed or approved by the State Board of Insurance, you will be so notified at the time it is purchased. You may cancel such insurance at any time by providing proper evidence to us that you have obtained insurance as required by this Agreement and any security instruments.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement.  It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your Previous Balance," and your "New Balance."   Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES on credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A monthly FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "average daily balance" method. To get the average daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid FINANCE CHARGES. This gives us a daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "average daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any FINANCE CHARGE is determined by applying the monthly "Periodic Rate" to the balance described herein. This is your FINANCE CHARGE calculated by applying a Periodic Rate.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows.  We start with an independent index which is the prime rate as published in The Wall Street Journal's "Money Rates" table.  If multiple prime rates are quoted in the table, then the highest prime rate will be the Index Rate (the "Index").  We will use the most recent Index value available to us as of the date of any ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your First Payment Stream, we subtract a margin from the value of the Index, then divide the value by 12 (monthly). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by 12 (monthly). This result is the ANNUAL PERCENTAGE RATE for your First Payment Stream. To determine the Periodic Rate that will apply to your Second Payment Stream, we subtract a margin from the value of the Index, then divide the value by 12 (monthly). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by 12 (monthly). This result is the ANNUAL PERCENTAGE RATE for your Second Payment Stream. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line will increase or decrease as the Index increases or decreases from time to time.  Any increase in the Periodic Rate will take the form of a higher final payment.  Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect as of the first day of the monthly billing cycle, based on the Index in effect on the last business day of the calendar month ending within that billing cycle.  In no event will the corresponding ANNUAL PERCENTAGE RATE be: (a) less than 6.600% per annum, except as may be shown below for any initial discount period; or (b) more than the lesser of 18.000% or the maximum rate allowed by applicable law.  Today the Index is 8.250% per annum, and therefore the initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line are as stated below:

**Current Rates for the First Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Monthly Periodic Rate |
|---|---|---|---|
| All Balances | -0.750% | 7.500% | 0.62500% |

**Current Rates for the Second Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Monthly Periodic Rate |
|---|---|---|---|
| All Balances | -0.750% | 7.500% | 0.62500% |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.  The interest rate on this Agreement has been implemented under the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code. No matter what else may be stated in any other provision of this Agreement or in any other document you may have with us, you do not agree or intend to pay, and we do not agree or intend to charge any

## EQUITY OPTIMIZER CREDIT AGREEMENT AND DISCLOSURE
(Continued)

Loan No: 4355767000052172

Page

Interest or fee for the Equity Optimizer Credit Agreement and Disclosure which would in any way cause us to contract for, charge or colle
more for the Credit Line Account than the maximum we would be permitted to charge or collect by any applicable federal or Texas state la
The right to accelerate maturity or sums due under this Agreement does not include the right to accelerate any interest which has not otherwi
been accrued on the date of such acceleration, and we do not intend to charge or collect any unearned interest in the event of acceleration. A
sums paid or agreed to be paid to us for the use, forbearance or detention of sums paid under this Agreement shall, to the extent permitted I
applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Agreement until payment
full so that the rate or amount of interest on account of the loan evidenced by this Agreement does not exceed the applicable usury ceilin
When the term "interest" is used in the context of "payment of interest", it is the intent of the parties that all such references shall be
accrued unpaid interest, and in no event will you ever be required to pay unearned interest.

**Conversion Option.** This Agreement contains an option to convert the interest rate from a variable rate with interest rate limits to a fixed rate
calculated below. The following information is representative of conversion features recently offered by us.

**ANNUAL PERCENTAGE RATE Increase.** Your **ANNUAL PERCENTAGE RATE** may increase if you exercise this option to convert to a fixe
rate.

**Conversion Periods.** You can exercise the option to convert to a fixed rate only during the following period or periods: Only during th
Draw Period described in the "Term" section above.

**Rate Determination.** The fixed rate will be determined as follows: The **ANNUAL PERCENTAGE RATE** for each Fixed Rate Loan will n
exceed 18%, will not include costs other than interest, and will be determined, as described below, at the time of the Fixed Option Lo
request by adding the applicable margin to the index rate for Fixed Option Loans. To get the monthly periodic rate on the Fixed Optic
Loans, we divide the **ANNUAL PERCENTAGE RATE** by 12.

The index rate for each Fixed Option Loan will be the rate of the monthly average five year Treasury Constant Maturity published in th
latest Federal Reserve Statistical Release (H.15) issued on or prior to the last business day of the month preceding the Fixed Option Lo
request ("5 Year CMT"). You may readily obtain and verify the 5 Year CMT at one of our offices. The changes in the 5 Year CMT ar
beyond our control. If the 5 Year CMT becomes unavailable, we will choose another index that also is readily available and verifiable ar
that is beyond our control. If we must change the index rate, we may also change the margins used for Fixed Option Loans, as long as th
historical fluctuations in the two indices were substantially similar (if the new index has been in existence) and as long as the new ind
and margin will produce an **ANNUAL PERCENTAGE RATE** similar to the one that was in effect at the time the 5 Year CMT becom
unavailable.

If, at the time you request a Fixed Option Loan, you agree to have the Minimum Payment for that Fixed Option Loan automatically deducte
from a Compass Bank deposit account, the **ANNUAL PERCENTAGE RATE** on that Fixed Option Loan will be 0.5% lower than it otherwis
would be. The **ANNUAL PERCENTAGE RATE** on that Fixed Option Loan may increase by 0.5% if you terminate the automatic paymen
deductions. The increase in rate will result in a higher monthly payment on the Fixed Option Loan.

The margin for each Fixed Option Loan will be **4.000%** if you agree to automatic payment deductions from a Compass Bank depos
account or **4.600%** without your agreement to the automatic payment deductions.

The index rate for Fixed Option Loans on the date of this Agreement is **5.070%**. Based on this index value, the **ANNUAL PERCENTAG
RATE** for a Fixed Option Loan would be **9.070%** with automatic payment deduction from a Compass Bank deposit account or **9.570**
without these deductions. The monthly periodic rate would be **0.756%** with automatic payment deductions from a Compass Bank deposi
account or **0.798%** without these deductions.

**Conversion Rules.** You can convert to a fixed rate only during the period or periods described above. In addition, the following rules app
to the conversion option under this Agreement: All advances will become part of the revolving balance on your Credit Line Account (th
"Revolving Balance") unless, at the time of an advance, you specify that the advance is to be a "Fixed Option Loan" as described in th
Agreement.

**General.** A Fixed Option Loan is a credit advance under this Agreement that must be repaid over a fixed term with scheduled month
payments. Fixed Option Loans, in the minimum amount of $4,000.00, may be requested only by phone or in person at a Compass Bar
office, and are subject to your Credit Limit. The term of each Fixed Option Loan will be the period you select at the time of the Loan, wit
a maximum term of fifteen (15) years. You are limited to two (2)Fixed Option Loan requests in a 365-day period and to a maximum
three (3)Fixed Option Loans outstanding at any time. You agree to follow all procedures we specify and to sign any documents we requi
to establish a Fixed Option Loan. You understand that we may allow you to establish a Fixed Option Loan without requiring you to sign ar
documents. We will send you a confirmation statement for each Fixed Option Loan you obtain, and you agree to notify us within ten (1
days if you believe the confirmation statement is wrong. Otherwise, the confirmation statement will apply to that Fixed Option Loan.

**Statements on Fixed Option Loans.** We will send you a separate statement for each Fixed Option Loan, as well as for your Revolvir
Balance. All statements will include the applicable information described in the "Periodic Statement" provision above.

**Minimum Payment on Fixed Option Loans.** We will calculate a separate Minimum Payment for the Revolving Balance and for eac
Fixed Option Loan. You may pay all or a part of the outstanding balance on the Revolving Balance and any Fixed Option Loan at any tin
without penalty other than any reimbursement to Lender of any closing costs Lender has paid on your behalf under the terms of th
Addendum to this Agreement.

The Regular Payment on a Fixed Option Loan is equal to the monthly amount that would pay off the Fixed Option Loan advance ar
finance charges if all payments are made as scheduled during the term of that Loan. The Minimum Payment will be the Regular Paymen
plus any amount past due on that Fixed Option Loan and all other fees and charges. The last payment during the term of each Fixed Optic
Loan will be equal to the balance of that Loan, plus all finance charges and other fees. The final payment may be larger than the schedule
Minimum Payment.

**Late Charge on Fixed Option Loans.** Late charges will be assessed separately for Minimum Payments on the Revolving Balance ar
Minimum Payments on each Fixed Option Loan. If we have not received the Minimum Payment on a Fixed Option Loan within the tin
period designated in the Late Charge provision below, we may charge you the specified amount.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set for
below:

**Dishonored Check Charge.** You will pay a processing fee of $25.00 if any check given by you to us as a payment on this loan
dishonored.

**Fee to Stop Payment.** Your Credit Line Account may be charged $25.00 when you request a stop payment on your account.

**Charge for Advance Less than Minimum.** Your Credit Line Account may be charged $35.00 if you obtain a credit advance for less than th
minimum advance amount disclosed above, whether we decide to honor it or whether we refuse to honor it, unless applicable law requir
a lower charge or prohibits any charge.

**Late Charge.** Your payment will be late if it remains unpaid 10 days or more after the "Payment Due Date" shown on your period
statement. If your payment is late we may charge you 5.000% of the payment or $15.00, whichever is less.

**Security Interest Charges.** You agree to pay all security interest charges related to your Credit Line as set forth below:

| | |
|---|---|
| LandAm OneStop Flood Hazard Cert | $8.00 |
| Appraisal Fee | $105.00 |
| Recording Fees | $36.00 |
| Total | $149.00 |

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in or
payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at an
time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities,
any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action
inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain requir
insurance, waste or destructive use of the dwelling, failure to pay taxes, death of any persons liable on the Credit Line account, transfer
title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or th
use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce yo
Credit Limit during any period in which any of the following are in effect:

EQUITY OPTIMIZER CREDIT AGREEMENT
(Continued)

includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

(7) We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum ANNUAL PERCENTAGE RATE under your Credit Line Account is reached.

**Change In Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the rate in effect at the time the original Index becomes unavailable.

**Collection Costs.** We may hire an attorney who is not our salaried employee to help collect this Agreement if you do not pay, and you will pay our reasonable attorneys' fees. You also will pay us all other amounts we actually incur as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Agreement and, to the extent permitted by law, the reasonable costs of foreclosing upon or selling the Property.

**Rate Increase.** In addition to our other rights during termination and acceleration, we may increase the variable ANNUAL PERCENTAGE RATE under this Agreement to 18.000 percent per annum. The ANNUAL PERCENTAGE RATE will not exceed the maximum rate permitted by applicable law. If we do not increase the ANNUAL PERCENTAGE RATE upon termination or acceleration of your Credit Line Account, it will continue at the variable rate in effect as of the date of termination or acceleration of your Credit Line Account.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all Convenience Line Checks and any other access devices. Any use of Convenience Line Checks or other access devices following suspension or termination may be considered fraudulent. You will remain liable for any further use of Convenience Line Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all Convenience Line Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under the Credit Line at any time without penalty, except we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payments will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree that to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Compass Bank, DALLAS PRESTON CENTER, 6071 SHERRY LANE, DALLAS, TX 75225.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Annual Review.** You agree that you will provide us with a current financial statement, a new credit application, or both, annually, on forms provided by us. Based upon this information we will conduct an annual review of your Credit Line Account. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an annual inspection, at our sole option and expense. You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Deed of Trust. Your rights under this Agreement belong to you only and may not be transferred or assigned. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Jury Waiver.** We and you hereby waive the right to trial by jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.

**Additional Events Of Default.** Notwithstanding any other provisions herein to the contrary, any material adverse change in the financial condition of any guarantor also shall be an Event of Default hereunder.

**Amendments.** This Credit Agreement constitutes the entire understanding and agreements of the parties as to the matters set forth in this Credit Agreement. No alteration or amendment of this Credit Agreement shall be effective unless given in writing and signed by the party or parties sought to be bound by the alteration or amendment.

**Additional Provisions.** Notwithstanding any other provisions of this Credit Agreement to the contrary: a)Lender's Remedies. Lender also may exercise any and all remedies available to it. Lender's rights are cumulative and may be exercised together, separately, and in any order. b) Prepayments. The terms "prepayment" and "early payment" mean any payment that exceeds the combined amount of interest, principal, and charges due as of the date Lender receives that payment. The amount of this excess will be applied to the outstanding principal balance. c)Final payment. You agree that, if you owe any late charges, collection costs or other amounts under this Credit Agreement or any related documents, your final payment under this Credit Agreement will include all of these amounts, as well as all unpaid principal and accrued interest.

**Computing Finance Charges.** Notwithstanding any provisions of this Agreement to the contrary, Finance Charges will be calculated separately for advances on the Revolving Balance and for each Fixed Option Loan. If any amount included in the Revolving Balance is subject to a special periodic rate (a "Special Offer Balance") as a result of an offer we made to you, we will calculate separately the average daily balance for each Special Offer Balance.

**Irregular Payments/Delay In Enforcement.** Subject to applicable law, we reserve the right, at any time and in our sole discretion, to delay imposing or not to impose part or all of any fee or other amount permitted by this Agreement or to delay exercising or not to exercise any of its other rights under this Agreement and, should we do so, we will not waive our right to impose such fee or other amount and to exercise the right as set forth in this Agreement in the future. Without limiting the foregoing, and subject to applicable law, we may, at its option (a) accept late or partial payments; (b) agree to extend the due date of any payment due under this Agreement for any length of time and/or (c) release any other person responsible under this Agreement, all without notifying you and without releasing you from the obligation to pay in full all amounts owing under this Agreement and to perform all other obligations under this Agreement. To the extent allowed by applicable law, we may take other action not described in this Agreement and, by doing so, we do not limit and will not lose our rights under this Agreement.

## EQUITY OPTIMIZER CREDIT AGREEMENT AND DISCLOSURE

Loan No: 4355767000052172

(Continued)

Page

**Unauthorized Check Transactions and Forgeries.** Our records will be deemed correct unless you timely established with us that we made error. It is essential that any unauthorized Convenience Check, alterations or forgeries (collectively referred to as "exceptions") be reported us as promptly as possible. Otherwise, we may not be liable for such exceptions. Therefore, it is necessary that you carefully examine ea monthly periodic statement and report any exceptions to us. We will not return any Convenience Checks to you after they are paid, but y may obtain copies if needed. You agree that this is a reasonable manner for making Convenience Checks available to you, and you agree to p any charge that we may reasonably impose for providing copies of any Convenience Checks to you.

In order to determine whether you have acted in a prompt and reasonable manner in reviewing the monthly periodic statements and reportir any forgeries or alterations to us, you agree that we may impose the following time limitations: (i) You must request us to send any suspecte forged or altered item within sixty (60) days after we sent the monthly periodic statement covering such item to you; and (ii) You must repc any suspected forgery or alteration to us within thirty (30) days after we send the requested item. If you fail to request any disputed item discover and report any forgery or alteration to us within the period specified above, we may not be liable for such exception. We will retain tr original and/or copies of Convenience Checks for the period of time required by applicable law.

**Construction of Documents.** In the event of any conflict within the provisions of this document or between this document and any Relate Document, and notwithstanding any other provision to the contrary in any of the foregoing, the provisions most favorable to Lender sh control. The parties hereto agree and acknowledge that no rule of construction permitting or requiring any claimed ambiguities to be resolve against the drafting party shall be employed in the interpretation of this document or any of the Related Documents.

**Errors and Omissions.** You agree that if deemed necessary by Lender or any agent closing the loan evidenced by this Agreement ("the Loan' Lender or the agent may correct and adjust this Agreement and any other documents executed in connection with the Loan ("Relatε Documents") on your behalf, as if you were making the correction or adjustment, in order to correct clerical error. A clerical error is informatic in a document that is missing or that does not reflect accurately your agreement with Lender at the time the document was executed. If ar such clerical errors are material changes, you agree to fully cooperate in correcting such errors within 30 days of the date of mailing by Lend of a request to do that. Any change in the documents after they are signed to reflect a change in the agreement of the parties is an "alteratior or "amendment," which must be in writing and signed by the party who will be bound by the change.

**Jurisdiction.** Any legal action or proceeding brought by Lender or Borrower against the other arising out of or relating to the loan evidenced t this instrument (a "Proceeding") shall be instituted in the federal court for or the state court sitting in the county where Lender's office th made this loan is located. With respect to any Proceeding, each Borrower, to the fullest extent permitted by law: (i) waives any objections th Borrower may now or hereafter have based on venue and/or forum non conveniens of any Proceeding in such court; and (ii) irrevocably submit to the jurisdiction of any such court in any Proceeding. Notwithstanding anything to the contrary herein, Lender may commence leg proceedings or otherwise proceed against Borrower in any other jurisdiction if determined by Lender to be necessary in order to fully enforce exercise any right or remedy of Lender relating to this loan, including without limitation, realization upon collateral that secures this loan.

**Texas Lending Statute.** Chapter 346 of the Texas Finance Code (which regulates certain revolving accounts) does not apply to this Agreement.

**Rate Increase Upon Default.** Notwithstanding any provisions of this Agreement to the contrary, if you do not meet the repayment terms of th Credit Agreement, we may increase the ANNUAL PERCENTAGE RATE under this agreement to eighteen percent (18%). In no event will th ANNUAL PERCENTAGE RATE exceed the maximum rate permitted by applicable law.

**Cancellation of Credit Insurance on Prior Loan.** This paragraph applies if this Credit Line Account renews, replaces, refinances, or increases tr credit line of an existing home equity line of credit with us ("prior line of credit"). If you purchased credit insurance coverage for the prior ι credit, you understand that credit insurance will automatically terminate when you sign this Agreement. This paragraph applies to creε insurance only and does not apply to CreditCARE(R). CreditCARE is a debt cancellation/suspension plan we offer and is not credit insurance.

**Governing Law.** This Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Texas. Th Agreement has been accepted by us in the State of Texas.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define tr provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Deed of Trust, is the best evidence of your agreements with us. If we go τ court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Deed of Trust or any othε document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the sam validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is tr best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that tr rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge tha you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice ar the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Line of Credit," given with the application.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS EQUITY OPTIMIZER CREDIT AGREEMENT AND DISCLOSURE AN ALL OTHER DOCUMENTS RELATING TO THIS DEBT AND THAT ALL BLANKS WERE FILLED IN PRIOR TO SIGNING.  BORROWER ALS ACKNOWLEDGES RECEIPT OF THE DISCLOSURES REQUIRED BY SECTION 50(g), ARTICLE XVI, TEXAS CONSTITUTION AT LEAST 12 DAY PRIOR TO THE DATE OF THIS AGREEMENT.

THIS AGREEMENT MUST BE SIGNED AT THE OFFICE OF THE LENDER, AN ATTORNEY AT LAW, OR A TITLE COMPANY.

BORROWER:

X _____
JAMES JUDD

Effective Disbursement Date: _____

*0210000435576700005 2172TSYS0360*

# TEXAS HOME EQUITY LINE OF CREDIT ADDENDUM

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $126,000.00 | 07-24-2006 | 07-24-2041 | *** | RE2 | | 22275 | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower: JAMES JUDD
4115 LA PLACE DR
DALLAS, TX 75220

Lender: Compass Bank
DALLAS PRESTON CENTER
8071 SHERRY LANE
DALLAS, TX 75225
9727058801

This TEXAS HOME EQUITY LINE OF CREDIT ADDENDUM is attached to and by this reference is made a part of the Equity Optimizer Credit Agreement and Disclosure, dated July 24, 2006, and executed in connection with a loan or other financial accommodations between COMPASS BANK and JAMES JUDD.

**Changes in the Index Rate**
The rate for your loan is a variable rate. The disclosure of the current Index and the rates for your line of credit contained in this addendum are based on the Index in effect on the day your loan documents were loaded to our system and ready to print and could have changed (gone up or down) since then. To check the current Index Rate (Prime Rate as published in the Wall Street Journal's "Money Rates" table), consult your Compass Banking Center or a newspaper publishing the Index Rate.

**How We Apply Your Payments**
If you choose to purchase the CreditCARE(R) Plan when you get your loan, then we will apply any payment we receive from you to the monthly fee for the Plan before we apply it to pay other amounts due.

**Renewal of Draw Period**
During any renewal of the Draw Period, the Regular Payment for the Revolving Balance on your Line of Credit Account will be calculated the same way it is calculated for the initial Draw Period.

**Miscellaneous**
All capitalized terms used in this Addendum that are not otherwise defined in this Addendum shall have the same meanings as those terms have in the Agreement. "You" and "your" means each of the Borrowers signing below.

THIS TEXAS HOME EQUITY LINE OF CREDIT ADDENDUM IS EXECUTED ON JULY 24, 2006.

BORROWER:

X _____
JAMES JUDD

LASER PRO Lending, Ver. 5.35.00.101 Copr. Harland Financial Solutions, Inc. 1997, 2006. All Rights Reserved. - TX L:\CFI\LPL\D25.FC TX-58713200 PR-78

*0210000435576700052172TSYS0820*

# NOTICE OF FINAL AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $126,000.00 | 07-24-2006 | 07-24-2041 | *** | RE2 | | 22275 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** JAMES JUDD
4115 LA PLACE DR
DALLAS, TX 75220

**Lender:** Compass Bank
DALLAS PRESTON CENTER
6071 SHERRY LANE
DALLAS, TX 75225
9727058601

**THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**As used in this Notice, the following terms have the following meanings:**

**Loan.** The term "Loan" means the following described loan: a non-precomputed Variable Rate Disclosable Open-end Line of Credi Loan to an individual with a Credit Limit of $126,000.00.

**Loan Agreement.** The term "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, relating to the Loan, including without limitation the following:

## LOAN DOCUMENTS

Customer Information Profile: JAMES JUDD
TX Homestead Lien Contract and Deed of Trust for Real property located at 4115 LA PLACE DR DALLAS, TX 75220
Agreement to Provide Insurance: Real property located at 4115 LA PLACE DR DALLAS, TX 75220; owned by JUDD and MORRIS
Notice of Right to Cancel: JAMES JUDD
Address Affidavit JAMES JUDD303010
Acknowledgment of Invitation to Apply for CreditCARE
Disbursement Request and Authorization
Owners Affidavit Addendum: Real property located at 4115 LA PLACE DR DALLAS, TX 75220
Customer Identification Verification
Equity Optimizer Credit Agreement and Disclosure
Acknowledgment of Fair Market Value: Real property located at 4115 LA PLACE DR DALLAS, TX 75220
Notice of Insurance Requirements: Real property located at 411 LA PLACE DR DALLAS, TX 75220
Notice of Final Agreement
Notice of Right to Cancel: JAMES W MORRIS
TX Borrower's Acknowledgment: Real property located at 4115 LA PLACE DR DALLAS, TX 75220
Name Affidavit - JAMES JUDD and JAMES DUDLEY JUDD JR
COMPASS CONSUMER PRIVACY DISCLOSURE: JAMES JUDD and JAMES W MORRIS

**Parties.** The term "Parties" means Compass Bank and any and all entities or individuals who are obligated to repay the loan or have pledged property as security for the Loan, including without limitation the following:

**Borrower:** JAMES JUDD
**Grantor(s):** JAMES JUDD and JAMES W MORRIS

**This Notice of Final Agreement is given by Compass Bank pursuant to Section 26.02 of the Texas Business and Commerce Code. Each P who signs below, other than Compass Bank, acknowledges, represents, and warrants to Compass Bank that it has received, read understood this Notice of Final Agreement. This Notice is dated July 24, 2006.**

**BORROWER:**

X ______________________
JAMES JUDD

**GRANTOR:**

X ______________________
JAMES JUDD

X ______________________
JAMES W MORRIS

**LENDER:**

**COMPASS BANK**

X ______________________
Authorized Signer

LASER PRO Lending, Ver. 5.23.30.101 Copr. Harland Financial Solutions, Inc. 1997, 2006. All Rights Reserved. - TX LICFI\LPL\E1.FC TR-28725300 PR-78



*0210000435576700005217275Y50820*

# NOTICE OF FINAL AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $126,000.00 | 07-24-2008 | 07-24-2041 | | RE2 | | 22275 | |
| References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. | | | | | | | |
| Any item above containing "****" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** JAMES JUDD
4115 LA PLACE DR
DALLAS, TX 75220

**Lender:** Compass Bank
DALLAS PRESTON CENTER
8071 SHERRY LANE
DALLAS, TX 75225
9727058601

---

THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

As used in this Notice, the following terms have the following meanings:

**Loan.** The term "Loan" means the following described loan: a non-precomputed Variable Rate Disclosable Open-end Line of Credit Loan to an individual with a Credit Limit of $126,000.00.

**Loan Agreement.** The term "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, relating to the Loan, including without limitation the following:

## LOAN DOCUMENTS

Customer Information Profile: JAMES JUDD
TX Homestead Lien Contract and Deed of Trust for Real property located at 4115 LA PLACE DR DALLAS, TX 75220
Agreement to Provide Insurance: Real property located at 4115 LA PLACE DR DALLAS, TX 75220; owned by JUDD and MORRIS
Notice of Right to Cancel: JAMES JUDD
Address Affidavit JAMES JUDD303010
Acknowledgment of Invitation to Apply for CreditCARE
Disbursement Request and Authorization
Owners Affidavit Addendum: Real property located at 4115 LA PLACE DR DALLAS, TX 75220
Customer Identification Verification

Equity Optimizer Credit Agreement and Disclosure
Acknowledgment of Fair Market Value: Real property located at 4115 LA PLACE DR DALLAS, TX 75220
Notice of Insurance Requirements: Real property located at 411 LA PLACE DR DALLAS, TX 75220
Notice of Final Agreement
TX Borrower's Acknowledgment: Real property located at 4115 LA PLACE DR DALLAS, TX 75220
Name Affidavit - JAMES JUDD and JAMES DUDLEY JUDD JR
COMPASS CONSUMER PRIVACY DISCLOSURE: JAMES JUDD and JAMES W MORRIS

**Parties.** The term "Parties" means Compass Bank and any and all entities or individuals who are obligated to repay the loan or have pledged property as security for the Loan, including without limitation the following:

Borrower: JAMES JUDD
Grantor(s): JAMES JUDD and JAMES W MORRIS

---

This Notice of Final Agreement is given by Compass Bank pursuant to Section 26.02 of the Texas Business and Commerce Code. Each Pa who signs below, other than Compass Bank, acknowledges, represents, and warrants to Compass Bank that it has received, read a understood this Notice of Final Agreement. This Notice is dated July 24, 2008.

BORROWER:

X _____
JAMES JUDD

GRANTOR:

X _____         X _____
JAMES JUDD                           JAMES W MORRIS

LENDER:

COMPASS BANK

X _____
Authorized Signer

LASER PRO Lending, Ver. 5.39.00.101  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - TX  L:\CFI\LPL\E31.FC  TR-48729300  PR-76

RECORDATION REQUESTED BY:
Compass Bank
DALLAS PRESTON CENTER
6071 SHERRY LANE
DALLAS, TX 75225

WHEN RECORDED MAIL TO:

Record and Return To:
United General Title Ins
Fiserv-280-A N John Rodes Blvd
JUDD JR., JAMES DUDL MELBOURNE, FL 32934

EB

435576L,000071448

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

# HOMESTEAD LIEN CONTRACT AND DEED OF TRUST
**THE EXTENSION OF CREDIT EVIDENCED BY THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST IS THE TYPE OF CREDIT DEFINED BY SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION.**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST dated July 24, 2006, is made and executed between JAMES DUDLEY JUDD JR, UNMARRIED PERSON AND JAMES W MORRIS, UNMARRIED PERSON , WHOSE ADDRESS IS 4115 LA PLACE DR DALLAS TX 75220 (referred to below as "Owner") and Compass Bank, whose address is 6071 SHERRY LANE, DALLAS, TX 75225 (referred to below as "Lender").

**GRANT OF LIEN.** For valuable consideration, Owner grants a lien under Section 50(a)(6), Article XVI, Texas Constitution in and to the following described real property, together with all improvements, all proceeds (including without limitation premium refunds) of each policy of insurance relating to any of the improvements, or the Real Property; and all easements, rights of way, and appurtenances; all water and water rights; and all other rights, royalties, and profits relating to (the "Real Property") located in Dallas County, State of Texas:

> LOT 4, BLOCK B/5084, OF SECTION TWO, FRENCHMAN'S CREEK ADDITION, AN ADDITION TO THE CITY OF DALLAS, DALLAS COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 80203, PAGE 579, OF THE MAP RECORDS OF DALLAS COUNTY, TEXAS.

The Real Property or its address is commonly known as 4115 LA PLACE DR, DALLAS, TX 75220.

Owner conveys the Real Property to Trustee in trust for the benefit of Lender as hereinafter set forth.

**REVOLVING LINE OF CREDIT.** This Homestead Lien Contract secures the indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Borrower so long as Borrower complies with all the terms of the Credit Agreement. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not ...ding finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, shall not exceed the Credit as provided in the Credit Agreement. It is the intention of Owner and Lender that this Homestead Lien Contract secures the balance ...anding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in the Credit Agreement and any intermediate balance.

THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF OWNER'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS HOMESTEAD LIEN CONTRACT AND DEED OF TRUST. THIS HOMESTEAD LIEN CONTRACT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**HOMESTEAD PROPERTY.** Owner represents to Lender that the Property is Owner's homestead. If a part of the Property is not now, or at any time in the future is determined not to be, Owner's homestead, Lender hereby disclaims any lien on such non-homestead property, it being Lender's intention to obtain a lien, as provided for by Section 50(a) (6), Article XVI, Texas Constitution, in Owner's homestead property only. If the Property, as a whole, is determined not to be Owner's homestead, this lien shall be governed by other applicable Texas law.

**OWNER'S REPRESENTATIONS AND PROMISES WITH RESPECT TO THE PROPERTY.** Owner represents and promises to Lender that: (a) this Homestead Lien Contract is executed at Borrower's request and not at the request of Lender; (b) Owner has the full power, right, and authority to enter into this Homestead Lien Contract and to hypothecate the Property; (c) the provisions of this Homestead Lien Contract do not conflict with, or result in a default under any agreement or other instrument binding upon Owner and do not result in a violation of any law, regulation, court decree or order applicable to Owner; (d) Owner has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Owner about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Homestead Lien Contract, Borrower shall pay to Lender all Indebtedness secured by this Homestead Lien Contract as it becomes due, and Borrower and Owner shall strictly perform all Borrower's and Owner's obligations under this Homestead Lien Contract.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Owner agree that Borrower's and Owner's possession and use of the Property shall be governed by the following provisions:

**Duty to Maintain.** Owner shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Nuisance, Waste.** Owner shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Owner will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent. This restriction will not apply to rights and easements (such as gas and oil) not owned by Owner and of which Owner has informed Lender in writing prior to Owner's signing of this Homestead Lien Contract.

**Removal of Improvements.** Owner shall not demolish or remove any improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any improvements, Lender may require Owner to make arrangements satisfactory to Lender to replace such improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Owner's compliance with the terms and conditions of this Homestead Lien Contract.

**Compliance with Governmental Requirements.** Owner shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Owner has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Owner to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Owner agrees neither to abandon or leave unattended the Property. Owner shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the


PLAINTIFF'S
EXHIBIT
C

Loan No: 4355767000052172 (Continued) Page 3

**Property.**

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Homestead Lien Contract upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Texas law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Homestead Lien Contract:

**Payment.** Owner shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Owner shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Homestead Lien Contract, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Homestead Lien Contract.

**Right to Contest.** Owner may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Owner shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Owner has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and Lender's reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Owner shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Owner shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Owner shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Owner shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $1,000.00. Owner will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Owner can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Homestead Lien Contract:

**Maintenance of Insurance.** Owner at Lender's request shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Owner shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Owner or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Owner agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the maximum amount of your credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Owner shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $1,000.00. Lender may make proof of loss if Owner fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at its election, apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or to the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Owner shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Owner from the proceeds for the reasonable cost of repair or restoration if Owner is not in default hereunder. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amounts owing to Lender under this Homestead Lien Contract, then to prepay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Owner.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Homestead Lien Contract at any trustee's sale or other sale held under the provisions of this Homestead Lien Contract, or at any foreclosure sale of such Property.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Homestead Lien Contract, to the extent compliance with the terms of this Homestead Lien Contract would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Homestead Lien Contract for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Owner fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. To the extent permitted by law, all such expenses shall bear interest at the rate charged under the Credit Agreement, or except for expenses related to insurance, at any default rate stated in the Credit Agreement. The Homestead Lien Contract also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Homestead Lien Contract:

**Title.** Owner warrants that: (a) Owner holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Homestead Lien Contract, and (b) Owner has the full right, power, and authority to execute and deliver this Homestead Lien Contract to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Owner warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Owner's title or the interest of Lender under this Homestead Lien Contract, Owner shall defend the action at Owner's expense. Owner may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Owner will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Owner warrants that the Property and Owner's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Homestead Lien Contract:

**Existing Lien.** The lien of this Homestead Lien Contract securing the Indebtedness shall be subordinate to an existing lien. Owner expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Owner shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Homestead Lien Contract by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Owner shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION, JUDGMENTS AND AWARDS.** The following provisions relating to condemnation proceedings, judgments, decrees and awards, for injury to the Property are a part of this Homestead Lien Contract:

Application of Net Proceeds. To the extent permitted by applicable law, all judgments, decrees and awards for injury or damage to the Property, or any part of the Property, and awards pursuant to proceedings for condemnation of the Property, (hereinafter collectively referred to as awards), are hereby absolutely assigned to Lender, and in awards, Owner agrees to immediately turn over and to pay such awards to Lender. All awards, which are received by, or which are payable to either Owner or Lender, shall be applied, at Lender's sole option and discretion, and in such manner as Lender may determine (after payment of all reasonable costs, expenses and attorneys' fees necessarily paid or incurred by Owner and/or Lender), for the purpose of: (a) replacing or restoring the condemned, expropriated, confiscated, or taken Property; or (b) reducing the then outstanding balance of the Indebtedness, together with interest thereon, with such payments being applied in the manner provided in this Homestead Lien Contract. Owner's receipt of such awards and the application of such awards as provided in this Homestead Lien Contract shall not affect the lien of this Homestead Lien Contract.

Notice of Proceedings. Owner shall immediately notify Lender in writing should all or any part of the Property become subject to any condemnation or expropriation proceedings or other similar proceedings, including without limitation, any condemnation, confiscation, eminent domain, inverse condemnation or temporary requisition or taking of the mortgaged Property, or any part or parts of the Property. Owner further agrees to promptly take such steps as may be necessary and proper within Lender's sole judgment and at Owner's expense, to defend any such condemnation or expropriation proceedings and obtain the proceeds derived from such proceedings. Owner shall not agree to any settlement or compromise or any condemnation or expropriation claim without Lender's prior written consent.

Lender's Participation. Lender may, at Lender's sole option, elect to participate in any such condemnation or expropriation proceedings and be represented by counsel of Lender's choice. Owner agrees to provide Lender with such documentation as Lender may request to permit Lender to so participate and to reimburse Lender for Lender's costs associated with Lender's participation, including Lender's reasonable attorneys' fees.

Conduct of Proceedings. If Owner fails to defend any such condemnation or expropriation proceedings to Lender's satisfaction, Lender may undertake the defense of such a proceeding for and on behalf of Owner. To this end, Owner irrevocably appoints Lender as Owner's agent and attorney-in-fact, such agency being coupled with an interest, to bring, defend, adjudicate, settle, or otherwise compromise such condemnation or expropriation claims; it being understood, however, that, unless one or more Events of Default (other than the condemnation or expropriation of the Property) then exists under this Homestead Lien Contract, Lender will not agree to any final settlement or compromise of any such condemnation or expropriation claim without Owner's prior approval, which approval shall not be unreasonably withheld.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Homestead Lien Contract:

Current Taxes, Fees and Charges. Upon request by Lender, Owner shall execute such documents in addition to this Homestead Lien Contract and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. To the extent permitted by applicable law, Owner shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Homestead Lien Contract, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Homestead Lien Contract.

Payment. Owner shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Owner shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Homestead Lien Contract, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Homestead Lien Contract.

Subsequent Taxes. If any tax to which this section applies is enacted subsequent to the date of this Homestead Lien Contract, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Owner either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Homestead Lien Contract:

Further Assurances. At any time, and from time to time, upon request of Lender, Owner will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Owner's obligations under the Credit Agreement, this Homestead Lien Contract, and the Related Documents, and (2) the liens and security interests created by this Homestead Lien Contract on the Property, whether now owned or hereafter acquired by Owner. Unless prohibited by law or Lender agrees to the contrary in writing, Owner shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

Attorney-In-Fact. To the extent permitted by applicable law, if Owner fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Owner and at Owner's expense. For such purposes, Owner hereby irrevocably appoints Lender as Owner's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower pays all the Indebtedness, including without limitation all future advances, when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Owner under this Homestead Lien Contract, Lender shall execute and deliver to Owner a suitable satisfaction of this Homestead Lien Contract. Owner will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Owner will be in default under this Homestead Lien Contract if any of the following happen: (A) Owner commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Borrower's or Owner's income, assets, liabilities, or any other aspects of Borrower's or Owner's financial condition. (B) Borrower does not meet the repayment terms of the Credit Agreement. (C) Owner's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

Accelerate Indebtedness. After giving any required notice of default and after Owner's failure to cure the default during any required cure period, Lender may declare due the entire Indebtedness.

Foreclosure By Court Order Only. If Lender forecloses upon the lien granted in this Homestead Lien Contract, Lender will comply with the applicable rules of civil procedure promulgated by the Texas Supreme Court for expedited foreclosure proceedings as those rules may change from time to time, or Lender may exercise such other remedy as may be available to Lender for loans made pursuant to the authority of Section 50(a)(6), Article XVI of the Texas Constitution. When Lender has complied with the appropriate procedures to obtain permission to foreclose pursuant to Section 51.002 of the Texas Property Code, as it may be amended from time to time, Lender may request the Trustee to foreclose by power of sale and the Trustee shall do so consistently with the rules of civil procedure and Section 51.002 of the Texas Property Code. The Trustee shall have all the powers granted to a trustee under the terms of Section 51.002 of the Texas Property Code and all amendments thereto and all other rights and remedies that are now available to or may hereafter be granted to Trustee to the extent such rights and remedies are consistent with loans made pursuant to the authority of Section 50(a)(6), Article XVI of the Texas Constitution. Lender may appoint in writing a substitute or successor Trustee, succeeding to all rights and responsibilities of either personally or by agent, give notice of the foreclosure sale as required by the Texas Property Code as then amended, (2) sell and convey all or part of the Property to the highest bidder for cash with a general warranty deed binding Owner, subject to prior liens and other exception to conveyance and warranty, and (3) from the proceeds of the sale, pay in order: (a) expenses of foreclosure; (b) to Lender the full amount of principal, interest and other permitted charges; (c) any amounts required by law to be paid before payments to Owner; and (d) to Owner any balance.

**No Deficiency Judgment.** Lender shall not obtain a judgment for any deficiency remaining in the indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Rights and Remedies on Default section unless the indebtedness was obtained by Owner by actual fraud.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Homestead Lien Contract or the Credit Agreement or available at law or in equity.

**Cure Notice.** Owner acknowledges and agrees that Article XVI, Section 50(a)(6)(Q)(x) of the Texas Constitution provides Lender and any holder of this Homestead Lien Contract with the right to correct a failure to comply with Lender's or holder's obligations under the extension of credit. A notice of non-compliance with applicable law to Lender or the holder of this Homestead Lien Contract may be in writing and mailed to:

> Compass Bank
> Loan Customer Service
> P. O. Box 10566
> Birmingham, AL 35296

or to the address to which Owner mails Owner's payments or to a different address if Owner is given notice pursuant to this Homestead Lien Contract of that different address.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Owner's obligations under this Homestead Lien Contract, after Owner's failure to do so, that decision by Lender will not affect Lender's right to declare Owner in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Homestead Lien Contract, Lender shall be entitled to recover such sum as the court may adjudge reasonable as Lender's attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Owner also will pay any court costs, in addition to all other sums provided by law. In the event of foreclosure of this Homestead Lien Contract, Lender shall be entitled to recover from Owner Lender's reasonable attorneys' fees to the extent permitted by law, and actual disbursements that Lender necessarily incurs in pursuing such foreclosure.

**NOTICES.** Any other notice required to be given under this Homestead Lien Contract shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Homestead Lien Contract. Any person may change his or her address for notices under this Homestead Lien Contract by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Owner agrees to keep Lender informed at all times of Owner's current address. Unless otherwise provided or required by law, if there is more than one Owner, any notice given by Lender to any Owner is deemed to be notice given to all Owners. It will be Owner's responsibility to tell the others of the notice from Lender.

**CONSTRUCTION OF DOCUMENTS.** In the event of any conflict within the provisions of this document or between this document and any Related Document, and notwithstanding any other provision to the contrary in any of the foregoing, the provisions most favorable to Lender shall control. The parties hereto agree and acknowledge that no rule of construction permitting or requiring any claimed ambiguities to be resolved against the drafting party shall be employed in the interpretation of this document or any of the Related Documents.

**ERRORS AND OMISSIONS.** The parties agree that if deemed necessary by Lender or any agent closing the loan evidenced by the Note, Lender or the agent may correct and adjust this document and any Related Documents on behalf of any other party, as if such other party were making the correction or adjustment, in order to correct clerical errors. A clerical error is information in a document that is missing or that does not reflect accurately another party's agreement with Lender at the time the document was executed. If any such clerical errors are material that. Any change in the documents after they are signed to reflect a change in the agreement of the parties is an "alteration" or "amendment," changes, the other party agrees to fully cooperate in correcting such errors within 30 days of the date of mailing by Lender of a request to do which must be in writing and signed by the party that will be bound by the change.

**JURISDICTION.** Except as otherwise provided, any legal action or proceeding arising out of or relating to the loan or other extension of credit secured by this instrument, or to enforce and defend any rights, remedies, or provisions contained in this instrument, (a "Proceeding") shall be instituted in the federal court for or the state court sitting in the county where Lender's office that made this loan is located. With respect to any Proceeding, brought by or against Lender, each of the other parties hereto, to the fullest extent permitted by law: (i) waives any objections that each such party may now or hereafter have based on venue and/or forum non conveniens of any Proceeding in such court; and (ii) irrevocably submits to the jurisdiction of any such court in any Proceeding. Notwithstanding anything to the contrary herein, Lender may commence legal proceedings or otherwise proceed against any other party in any other jurisdiction if determined by Lender to be necessary in order to fully enforce or exercise any right or remedy of Lender relating to this loan including without limitation realization upon collateral that secures this loan.

**APPLICATION OF PROCEEDS.** If Borrower is in default and Lender proceeds to enforce its rights hereunder, the proceeds from any sale or other disposition of the Property shall be applied as follows (unless applicable law provides otherwise, in which case the proceeds will be applied as required by applicable law): first, to the expense of advertising, preparing, selling, and conveying the Property, including reasonable attorney fees incurred by Lender in enforcing its rights, including any injunction proceeding, bankruptcy, appeal, or other proceeding challenging the Lender's rights; second, to the payment of any amounts expended or that may be necessary to expend to pay insurance, taxes, assessments, and other liens and Mortgages or Deeds of Trust; third, in full or partial payment of the indebtedness in such order as Lender may elect; and fourth, the balance, if any, to be paid in accordance with the requirements of law.

**NO ASSIGNMENT.** Notwithstanding any other provisions herein to the contrary, each party signing below agrees not to assign any of the party's rights or obligations hereunder.

**NON-LIABILITY OF LENDER.** The relationship between Borrower and Lender created by this Agreement is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Borrower. Borrower is exercising Borrower's own judgment with respect to Borrower's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Borrower of any matter with respect to Borrower's business. Lender and Borrower intend that Lender may reasonably rely on all information supplied by Borrower and any investigation or failure to investigate will not diminish Lender's right to so rely.

**ADDITIONAL EVENTS OF DEFAULT.** Notwithstanding any other provisions herein to the contrary, any material adverse change in the financial condition of any guarantor also shall be an Event of Default hereunder.

**AUTHORIZATION TO OBTAIN PAYOFF INFORMATION.** Grantor authorizes any other party claiming an interest in the Property to disclose to Lender both information about that party's claim to the Property and the amount of Borrower's outstanding indebtedness to that party, including principal, interest and other fees and charges, that is secured by the Property.

**LENDER'S FORFEIT OF PRINCIPAL AND INTEREST.** As provided under Section 50(a)(6), Article XVI, of the Texas Constitution, Lender will forfeit all principal and interest on the loan secured by the lien created by this Homestead Lien Contract and Deed of Trust if Lender fails to comply with its obligations under Section 50(a)(6), unless the Lender cures such failure as provided by Section 50(a)(6)(Q)(x).

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Homestead Lien Contract:

**Amendments.** What is written in this Homestead Lien Contract and in the Related Documents is Owner's entire agreement with Lender concerning the matters covered by this Homestead Lien Contract. To be effective, any change or amendment to this Homestead Lien Contract must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Governing Law.** This Homestead Lien Contract will be governed by and interpreted in accordance with federal law and the laws of the State of Texas. This Homestead Lien Contract has been accepted by Lender in the State of Texas.

**Caption Headings.** Caption headings in this Homestead Lien Contract are for convenience purposes only and are not to be used to interpret or define the provisions of this Homestead Lien Contract.

**Joint and Several Liability.** All obligations of Borrower and Owner under this Homestead Lien Contract shall be joint and several, and all references to Owner shall mean each and every Owner, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Owner signing below is responsible for all obligations in this Homestead Lien Contract.

**Merger.** There shall be no merger of the interest or estate created by this Homestead Lien Contract with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**No Waiver by Lender.** Owner understands Lender will not give up any of Lender's rights under this Homestead Lien Contract unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Owner will not have to comply with the other provisions of this Homestead Lien Contract. Owner also understands that if Lender does consent to a request, that does not mean that Owner will not have to get Lender's consent again if the situation happens again. Owner further understands that just because Lender consents to one or more of Owner's requests, that does not mean Lender will be required to consent to any of Owner's future requests. Owner waives presentment, demand for payment, protest, notice of dishonor, notice of intent to accelerate, and notice of acceleration.

**Savings Clause.** It is agreed that notwithstanding any provision of this Homestead Lien Contract to the contrary, in no event shall this Homestead Lien Contract require or permit any action which would be prohibited by Section 50(a)(6), Art. XVI, Texas Constitution, and all provisions of this Homestead Lien Contract shall be modified to comply fully with Section 50(a)(6), Art. XVI, Texas Constitution. In particular, this section means (among other things), that Owner does not agree or intend to pay, and Lender does not agree or intend to contract for, charge or collect, any amount in the nature of a fee or charge for the Indebtedness which would in any way or event cause Lender to charge or collect more for extension of credit than the maximum Lender would be permitted to charge or collect by the laws of the State of Texas.

**Severability.** If a court finds that any provision of this Homestead Lien Contract is not valid or should not be enforced, that fact by itself will not mean that the rest of this Homestead Lien Contract will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Homestead Lien Contract even if a provision of this Homestead Lien Contract may be found to be invalid or unenforceable.

**Successors and Assigns.** Subject to any limitations stated in this Homestead Lien Contract on transfer of Owner's interest, this Homestead Lien Contract shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Owner, Lender, without notice to Owner, may deal with Owner's successors with reference to this Homestead Lien Contract and the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Homestead Lien Contract.

**Waive Jury.** All parties to this Homestead Lien Contract hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following words shall have the following meanings when used in this Homestead Lien Contract:

**Borrower.** The word "Borrower" means JAMES JUDD.

**Credit Agreement.** The words "Credit Agreement" mean the note or credit agreement executed by Borrower(s) in the principal amount of $126,000.00, dated July 24, 2008, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or agreement. . NOTICE TO OWNER: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.

**Event of Default.** The words "Event of Default" mean individually, collectively, and interchangeably any of the events of default set forth in this Homestead Lien Contract in the default section of this Homestead Lien Contract.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Homestead Lien Contract.

**Homestead Lien Contract.** The words "Homestead Lien Contract" mean this Homestead Lien Contract and Deed of Trust between Owner and Lender.

**Improvements.** The word "Improvements" means all existing and future improvements, fixtures, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Owner's obligations or expenses incurred by Lender to enforce Owner's obligations under the Homestead Lien Contract, together with interest on such amounts as provided in this Homestead Lien Contract.

**Lender.** The word "Lender" means Compass Bank, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Owner.** The word "Owner" means JAMES JUDD and JAMES W MORRIS and any and all persons and entities executing this Homestead Lien Contract, including without limitation all Borrowers and Owners named above. Any Owner who signs this Contract, but does not sign the Credit Agreement, is signing this Contract only to grant and convey that Owner's interest in the Real Property and to grant a security interest in Owner's interest in the Rents and Personal Property to Lender and is not personally liable under the Credit Agreement except as otherwise provided by contract or law.

**Property.** The word "Property" means collectively the Real Property and the Improvements. Notwithstanding language in any other agreement with Lender by Owner, the Indebtedness is secured by the Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Homestead Lien Contract.

**Related Documents.** The words "Related Documents" mean all promissory notes, loan agreements, environmental agreements, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Trustee.** The word "Trustee" means Ben Hayes Riggs, whose address is PO BOX 4444, Houston, TX 77210-4444, and any substitute or successor trustees.

OWNER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS HOMESTEAD LIEN CONTRACT, AND OWNER AGREES TO ITS TERMS. OWNER ACKNOWLEDGES THAT ALL BLANKS WERE FILLED IN PRIOR TO OWNER SIGNING THIS HOMESTEAD LIEN CONTRACT. OWNER FURTHER ACKNOWLEDGES THAT OWNER RECEIVED A COPY OF THE DISCLOSURES REQUIRED BY SECTION 50(g), ARTICLE XVI, TEXAS CONSTITUTION, AT LEAST 12 DAYS PRIOR TO THE DATE OF THIS HOMESTEAD LIEN CONTRACT.

OWNER:

X _____
JAMES JUDD

X _____
JAMES W MORRIS

HOMESTEAD LIEN CONTRACT AND DEED OF TRUST
(Continued)

Page 6

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Texas_ )
)
) SS
COUNTY OF _Dallas_ )

This instrument was acknowledged before me on _July 24_ , 20 _06_ by JAMES JUDD and JAMES W MORRIS.

JIM WOOLLEY
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct 11 2009

Notary Public, State of Texas

LASER PRO Lending, Ver. 6.35.99.101  Copr. Harland Financial Solutions, Inc. 1997, 2006.  All Rights Reserved.  - TX  L:\CFI\LPL\G01.FC  TR-89185222  PR-39

FILED AND RECORDED

OFFICIAL PUBLIC RECORDS

Cynthia Figueroa Calhoun

Cynthia Figueroa Calhoun, County Clerk
Dallas County  TEXAS
August 18, 2006  02:43:05 PM
FEE: $38.00    200600306045

 

## APPOINTMENT OF A SUBSTITUTE TRUSTEE

**Date of this appointment:**   Monday, June 1, 2009

### LOAN INFORMATION

**Loan number:** xxx5766000071448 and **Borrower(s):** James Dudley Judd Jr. aka James Judd & James W. Morris

**Date of the Promissory Note and Deed of Trust (or date signed):** Monday, July 24, 2006

**Name(s) of the maker(s) of the promissory note and grantor(s) of the deed of trust:**
   James Dudley Judd Jr. aka James Judd & James W. Morris

**Name and address of the original beneficiary under the Deed of Trust:**
   Compass Bank, 6071 Sherry Lane, Dallas, TX 75225

**Name and address of the Holder or Current Servicer of the promissory note and Deed of Trust:**

   The original beneficiary has been acquired by Banco Bilbao Vizaya Argentaria (BBVA and is now a part of the BBVA family of banks. Compass Bank is acting as servicer of this property. The Servicer's address is: P. O. Box 10566, Birmingham, AL 35296

**Amount of the original Promissory Note:** $126,000.00

**Property street address:** 4115 La Place Dr., Dallas, TX 75220

**Property legal description:**
   Lot 4, Block B/5084, of section two, Frenchman's Creek Addition, an addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 80203, Page 579, of the Map Records of Dallas County, Texas.

**Recording Information:** 200600306045 or such other record number as may be on file.

**Trustee's name stated in the deed of trust:** Ben Hayes Riggs

### NEED FOR A SUBSTITUTE TRUSTEE

**Conveyance:** On the date that the promissory note and deed of trust were dated or executed by the Borrower'(s); said Borrower(s) delivered to Ben Hayes Riggs, Trustee, a Deed of Trust that secured Borrower(s) obligation to pay the above described promissory note. The Deed of Trust was duly recorded and is incorporated herein by reference in its entirety.

**Resignation:** The Trustee named in the Deed of Trust has resigned as Trustee and a Substitute Trustee must be appointed. The Deed of Trust provides that the Beneficiary may appoint a Substitute Trustee by a designation in writing. This document satisfies that requirement.

**Default:** The Borrower is in default of the promissory note and the Deed of Trust; consequently, the note the entire unpaid balance is due and payable. The Beneficiary intends to enforce the power of sale that is set forth in the Note and Deed of Trust referred to above.

### APPOINTMENT

The holder of the Promissory Note and Beneficiary under the Deed of Trust hereby removes the original Trustee and all other successor Substitute Trustees, if any, and, by this document, appoints the following persons as Substitute Trustees, who shall exercise all rights, powers and duties that were set aside to the original Trustee under the Deed of Trust:


PLAINTIFF'S EXHIBIT

 

Substitute trustee(s): Shelley Ortolani, Mary Mancuso, Jim Akins, and/or S. Lee Stevenson, Jr.

The Beneficiary instructs, requests and authorizes the Substitute Trustee to sell the real and personal property described in the Deed of Trust by conducting and directing the execution of remedies under the Deed of Trust that are available to the Beneficiary.

This document authorizes the Substitute Trustee to enforce the power of sale contained in the Deed of Trust in accordance with its terms and the applicable law.

Signed on  6-2-09  .

Lender

BY _____
Jennifer Smith
Assistant Vice President

**Corporate Acknowledgment**

State of Alabama
County of Jefferson

Before me, the undersigned Notary Public, on this day personally appeared Jennifer Smith who is an Assistant Vice President for Compass Bank, a corporation, on behalf of the corporation, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on  June 2, 2009 .

_____
Notary Public, State of Alabama
MY COMMISSION EXPIRES MARCH 29, 2013

## NOTICE OF SUBSTITUTE TRUSTEE'S NON JUDICIAL FORECLOSURE SALE

The undersigned Substitute Trustee provides the following notice of a foreclosure sale:

**Loan number**:  xxx5766000071448 and **Borrower'(s) name**:  James Dudley Judd Jr. aka James Judd & James W. Morris

**Date of the Promissory Note and Deed of Trust (or date signed):**  Monday, July 24, 2006

**Name(s) of the maker(s) of the promissory note and grantor(s) of the deed of trust**: James Dudley Judd Jr. aka James Judd & James W. Morris

**Name and address of the original beneficiary under the Deed of Trust**:  Compass Bank, 6071 Sherry Lane, Dallas, TX 75225

**Name and address of the current beneficiary under the Deed of Trust if another lender holds the loan or servicer of the loan**:  Banco Bilbao Vizaya Argentaria (BBVA has acquired Compass Bank.  Compass Bank is acting as servicer of this property.  The Servicer's address is:  P. O. Box 10566, Birmingham, AL 35296

**Amount of the original Promissory Note**:  $126,000.00

**Property legal description and county**:     **Dallas County** Lot 4, Block B/5084, of section two, Frenchman's Creek Addition, an addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 80203, Page 579, of the Map Records of Dallas County, Texas.

**Date of the foreclosure sale:**     Tuesday, May 3, 2011

**The earliest time that the sale will begin is:** 10:00 a.m.  The sale shall begin within three hours of said time, no later.

**Place of the foreclosure sale**:  At the designated area or location which has been designated by the Commissioners' Court where non-judicial foreclosure sales are to take place or where foreclosure sales are customarily held in Dallas County, Texas.  If the Commissioner's have not designated an area for conducting foreclosure sales, then the sale shall be held at the Dallas county courthouse.

**Terms of the sale, Disclaimers and Limitations**:     A Substitute Trustee will sell the above described property by public auction.  The property will be sold at the sale to the highest bidder for cash or if the lender is the successful bidder, the lender will credit the amount of the bid to reduce the moneys owed on the Promissory Note.

**BE ADVISED THAT THE PURCHASER/GRANTEE SHOULD TENDER THE EXACT PURCHASE PRICE IN THE FORM OF A CASHIER'S CHECK OR CERTIFIED FUNDS**



PLAINTIFF'S EXHIBIT
E

TO THE TRUSTEE OR SUBSTITUTE TRUSTEE AT THE TIME OF THE PURCHASE. THE CASHERS CHECK MUST BE MADE PAYABLE TO STEVENSON & RICKER.

THE TRUSTEE OR SUBSTITUTE TRUSTEE DOES NOT ACCEPT CASH OR OTHER CHECKS. PAYMENT MUST BE MADE WITHIN 30 MINUTES FROM THE TIME THAT THE BID IS ACCEPTED OR 10 MINUTES BEFORE THE LAST TIME TO CONDUCT THE SALE, WHICHEVER COMES FIRST. THE CHECK MUST BE MADE IN THE EXACT AMOUNT OF THE PURCHASE PRICE.

IF THE HIGHEST BIDDER DOES NOT TENDER A CASHIER'S CHECK OR CERTIFIED FUNDS TO THE SUBSTITUTE TRUSTEE WITHIN SAID TIME DEADLINE, THEN THE BIDDING SHALL IMMEDIATELY BE RE-OPENED AND THE PROPERTY WILL BE SOLD TO THE NEXT HIGHEST BIDDER.

THE SALE IS SUBJECT TO ANY PRIOR LIENS, INCLUDING BUT NOT LIMITED TO: STATE PROPERTY TAX LIENS, TEXAS WORKFORCE COMMISSION LIENS, MECHANIC'S LIENS, INTERNAL REVENUE SERVICE TAX LIENS AS WELL AS ANY FEDERAL ABSTRACT OF JUDMENTS AND/OR CITY, COUNTY AND/OR STATE PROPERTY TAX LIENS , IF ANY;

THE GRANTEE/PURCHASER TAKES THE PROPERTY SUBJECT TO SAID LIENS, IF ANY. GRANTOR/SELLER DOES NOT WARRANT OR GUARANTY THAT NOTICE TO THE INTERNAL REVENUE SERVICE OR ANY OTHER PERSON OR ENTITY WAS TIMELY GIVEN AND THE GRANTEE/PURCHASER SHALL TAKE THE PROPERTY SUBJECT TO ANY TAX LIEN, CLAIM OR ENCUMBERANCE IF SAID NOTICE HAS NOT BEEN TIMELY MADE.

THE SALE IS ALSO SUBJECT TO ANY PENDING LITIGATION OR BANKRUPTCY ACTIONS WHICH MAY BE FILED ON OR BEFORE THE SALE DATE. GRANTOR/SELLER RESERVES THE RIGHT, BUT IS NOT OBLIGATED, TO CANCEL AND RESCIND THE SALE IN THE EVENT OF A BANKRUPTCY PROCEEDING, BANKRUPTCY STAYS, CLAIMS, TAX OR OTHER LIENS, OR ENCUMBERANCE WHICH MAY REQUIRE PRIOR NOTICE OF THE FORECLOSURE SALE, LITIGATION, OR OTHER MATTERS WHICH MAY PREVENT GRANTOR/SELLER FROM TRANSFERRING GOOD TITLE AT THE FORECLOSURE SALE.

THE SALE MAY BE VOIDED AND RESCINDED AT THE SELLER/GRANTOR'S OPTION IN THE EVENT THAT ANY ERRORS OCCURRED IN THE FORECLOSURE PROCESS INCLUDING BUT NOT LIMITED TO WRONG LEGAL DESCRIPTION, WRONG ADDRESS, FAILURE TO MAIL REQUIRED NOTICES TO THE BORROWERS OR OTHER PARTIES INCLUDING THE IRS, MISCALCULATION OF THE BIDDING INSTRUCTIONS, INCORRECT BID PRICE, ERRORS IN READING THE BID MADE BY EITHER THE TRUSTEE, MORTGAGE SERVICER OR BENEFICIARY.

THE SALE MAY ALSO BE VOIDED AND RESCINDED, AT THE SELLER/GRANTOR'S OPTION, IN THE EVENT THAT THE BORROWER REINSTATES THE LOAN.

IN THE EVENT THE SALE IS CANCELLED OR RESCINDED FOR ANY REASON, THE SUBSTITUTE TRUSTEE SHALL REFUND THE MONEYS PAID BY THE BUYER, THE SALE SHALL BE CANCELLED, AND THE SELLER/GRANTOR SHALL HAVE NO OTHER LIABILITY TO THE BUYER FOR THE CANCELLED OR RESCINDED SALE EXCEPT THE RETURN OF THE PURCHASE MONEYS.

THE SUBSTITUTE TRUSTEE SHALL NOT BE RESPONSIBLE FOR ISSUING REFUNDS OVER THE AMOUNT OF THE PURCHASE PRICE. IN THE EVENT THAT A PURCHASER/GRANTEE TENDERS MONEYS TO THE GRANTOR/SELLER WHICH EXCEEDS THE PURCHASE OR SALE PRICE, THE GRANTOR/SELLER SHALL REFUND THE SURPLUS AMOUNT ON ITS OWN TIME.

GRANTOR/SELLER SHALL NOT BE LIABLE FOR INTEREST, ANY CLAIMS SUCH AS LOSS OF USE OR CONSEQUENTIAL DAMAGES FOR ANY DELAYS IN REFUNDING SAID SURPLUS AMOUNTS.

THE PURCHASER/GRANTEE IS ADVISED THAT IT MAY TAKE 60 TO 90 DAYS TO RECEIVE THE SURPLUS OR REFUND AND THE PURCHASER/GRANTEE SHALL BE LIABLE FOR ANY COSTS, FEES, OR EXPENSES WHICH MAY BE INCURRED AS A RESULT OF THE SURPLUS OR REFUND INCLUDING BUT NOT LIMITED TO FEDERAL EXPRESS OR OTHER DELIVERY FEES.

THE TERMS OF THIS NOTICE SHALL SURVIVE THE SALE OF THE PROPERTY,

**Other Limitations on Warranty**: The Substitute Trustee makes no warranty, express or implied, concerning the property's condition, need of repair, existence or absence of any defects, fire or other property/hazard damage, including but not limited to cracked foundations, non working cooling or heating systems, mold or other environmental damage, contamination or hazards, visible, hidden, latent or otherwise. The Substitute Trustee hereby disclaims any and all warranties, express or implied concerning the property's workmanship, there are no implied warranties of any kind, including but not limited to warranties of merchantability or fitness for a particular purpose. The property will be transferred to the Grantee "as is", "where is" and "with all faults." The sale is subject to any and all claims, defenses, and cause of actions that James Dudley Judd Jr. aka James Judd & James W. Morris, the borrower(s), may have, if any. In the event of an action, lawsuit, bankruptcy filed prior to the sale date, court order or other legally binding document, this deed may be set aside and the Grantee's money refunded, less any actual attorney's fees, costs of court and other reasonable expenses. Grantor makes no representations or warranties concerning the priority of any lien; Grantee takes the property subject to any and all prior liens, if any, which may be attached to the property. Grantor expressly disclaims any consequential damages to Grantee.

**Reservations:** The sale is expressly subject to any title matters that may be referred to in the Deed of Trust. The sale and title to the property is subject to any and all prior matters of record that may

affect the property. Any prospective bidders should examine the property records to determine what other liens, encumbrances or reservations exist, if any, on the property.

Names of substitute trustees and contact address:
Shelley Ortolani, Mary Mancuso, Jim Akins, David L. Ricker, and/or S. Lee Stevenson, Jr.
In care of:
Stevenson & Ricker
One Castle Hills
1100 N.W. Loop 410, Suite 260
San Antonio, TX 78213

**Dated:** April 11, 2011

S. Lee Stevenson, Jr. -Substitute Trustee




## SUBSTITUTE TRUSTEE'S FORECLOSURE DEED

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**Property & Foreclosure Sale Information and References:**

| | |
|---|---|
| Original Maker of the Promissory Note and Grantor on the Deed of Trust: | James Dudley Judd Jr. aka James Judd & James W. Morris |
| Beneficiary's Name and Current Holder of the Note: | Compass Bank<br>P. O. Box 10566, Birmingham, AL 35296 |
| Date of the Promissory Note and Deed of Trust (or date signed): | Monday, July 24, 2006 |
| Original Loan Amount: | $126,000.00 |
| Legal Description: | Lot 4, Block B/5084, of section two, Frenchman's Creek Addition, an addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 80203, Page 579, of the Map Records of Dallas County, Texas. |
| Recording Information: | 200600306045 or such other record number as may be on file. |
| Trustee's Name: | Ben Hayes Riggs |
| Substitute Trustee's Name: | Shelley Ortolani, Mary Mancuso, Jim Akins, David L. Ricker, and/or S. Lee Stevenson, Jr. |
| Date of the Foreclosure Sale: | Tuesday, May 3, 2011 |
| Location of the Sale: | The area that has been designated for foreclosure sales in Dallas County, Texas. |
| Time of the Sale: | 12:09 |
| Buyer/Grantee's Name: | Compass Bank |
| Grantee's Mailing Address: | P. O. Box 10566, Birmingham, AL 35296 |
| Buyer/Grantee's County | Jefferson County, AL |
| Grantor's name: | Shelley Ortolani, Mary Mancuso, Jim Akins, David L. Ricker, and/or S. Lee Stevenson, Jr., as Substitute Trustee |
| Grantor's mailing address: | 1100 N.W. Loop 410, Suite 260 San Antonio, TX 78213 |
| Foreclosure Sale Price: | $129,006.98 |

**Note Default, Appointment of Substitute Trustee and Foreclosure Notices**

Per the above identified Deed of Trust, James Dudley Judd Jr. aka James Judd & James W. Morris conveyed to the above named Trustee the above identified property for the purposes of securing and enforcing payment of the above identified real estate lien note in the amount stated in the note to the payee of the note. James Dudley Judd Jr. aka James Judd & James W. Morris defaulted on the above identified promissory note and Deed of Trust. The holder made demand and then accelerated the Note since James Dudley Judd Jr. aka James Judd & James W. Morris failed to cure the default. The Trustee was not able to serve as trustee and perform the duties of trustee per the Deed of Trust; accordingly the holder of the note and Deed of Trust appointed the undersigned as a Substitute Trustee to enforce the Deed of Trust and perform the duties stated in the Deed of Trust and conduct a non judicial foreclosure sale. The appointment of substitute trustee is attached hereto as Exhibit 1. The Substitute Trustee filed the Notice of Foreclosure with the clerk of the real property records in Dallas County and posted the Notice of Foreclosure at the location designated by law, as designated by the appropriate county commissioners in Dallas County. The posting was done in the manner required by law on Monday, April 11, 2011 and on said date the Substitute Trustee sent the Debtor(s)/Borrower(s) a copy of the Notice of Foreclosure by certified return receipt mail, 21 days prior to the foreclosure sale. The Substitute Trustee sent all notices to James Dudley Judd Jr. aka James Judd & James W. Morris required by law, in the manner required by law; these notices included but were not limited to a notice of default and an opportunity to cure the default, a notice of acceleration of the loan and demand for payment. The Notice of Foreclosure was included with said notice of acceleration. Accordingly, the Holder of the Deed of Trust and the Substitute Trustee has duly satisfied all of the prerequisites required by law and by the Deed of Trust. The Substitute Trustee held the non-judicial foreclosure sale at the appointed date, at the appointed time and at the appointed place as stated in the Notice of Substitute Trustee's Sale. The sale was conducted in the manner required by law and according to the terms of the Notice of Foreclosure and Notice of Foreclosure Sale. The sale was made to the highest bidder according to the terms of the Deed of Trust and Notice of Foreclosure Sale. The Affidavit attached hereto and made a part hereof confirms the above recitations.

**Military Status:** The Substitute Trustee has not been given any information showing the Maker or any Guarantor of the Promissory Note and Deed of Trust, that are the subject of this foreclosure, were in any branch of military service during the time period covered by this foreclosure, or that said Maker is now in any military service of the United States of America. If the lender or servicer had the borrower's social security number, the substitute trustee may have searched the Department of Defense Manpower database to ascertain if the borrower was in military service at the time of the foreclosure.

**Conveyance:** In consideration of the bid and payment for the property, Grantor has granted, sold, and conveyed unto Grantee the following identified and described property: Lot 4, Block B/5084, of section two, Frenchman's Creek Addition, an addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 80203, Page 579, of the Map Records of Dallas County, Texas.

**Consideration:** This conveyance is based upon the consideration of ten dollars and other good and valuable consideration which has been paid unto the Grantor by the Grantee.

**Rights:** This conveyance is made unto Grantee to have and to hold the above described property, together with, all and singular, the rights and appurtenances thereto in any wise belonging unto the Grantee, its, his or her heirs or assigns forever.



PLAINTIFF'S EXHIBIT
F




**Limitations on Warranty:** Grantor hereby disclaims any and all warranty of fitness and Grantor makes no warranty, express or implied, concerning the property's condition, need of repair, existence or absence of any defects, fire or other property/hazard damage, mold, environmental damage or liability, visible, hidden, latent or otherwise. Grantor hereby disclaims any and all warranties, express or implied concerning the property's workmanship, there are no implied warranties of any kind, including but not limited to warranties of merchantability or fitness for a particular purpose. Grantor delivers the property to the Grantee "as is", "where is" and "with all faults." The sale is subject to any and all claims, defenses and cause of actions that James Dudley Judd Jr. aka James Judd & James W. Morris, the borrower(s), may have, if any. In the event of an action, dispute, contest, mistake, lawsuit, or bankruptcy filed prior to the sale date, court order or other legally binding document, this deed may be set aside and the Grantee's money refunded, less any actual attorney's fees, costs of court and other reasonable expenses. Grantor may set aside this sale for any clerical or other error or mistake including but not limited to an erroneous bid or sale amount, error in legal description, failure to provide proper notices to the borrower(s) or any other reason that the lender of substitute trustee needs to cancel or invalidate the foreclosure sale. The foreclosure sale and this deed are expressly subject to the terms of the notice of substitute trustee's sale which was posted prior to the sale; the notice of sale is incorporated into this deed and its terms and conditions survive the foreclosure sale and recordation of this deed. In the event this deed and foreclosure sale is cancelled or rescinded, the only damages available to the Grantee, Grantee's assigns or later purchasers, shall be the refund of the money paid to the Grantor by the Grantee, no other damages, express or implied shall be owed by the Grantor. No third party beneficiary rights are given to assigns or subsequent purchasers.

**Warranty:** TO HAVE AND TO HOLD the Property, subject to the aforesaid taxes, assessments and Permitted Exceptions, unto Grantee, Grantee's successors and assigns, forever; and Grantor does hereby bind Grantor and Grantor's successors to WARRANT AND FOREVER DEFEND the Property, subject to the aforesaid taxes, assessments and Permitted Exceptions, unto Grantee, Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise. This warranty excludes any and all reservations and exceptions to the conveyance.

**Reservations from and exceptions to the conveyance and warranty:** This conveyance is made subject to any and all valid and subsisting or recorded restrictions, conditions and covenants, easements, rights-of-way, prescriptive rights, whether of record or not, reservations including but not limited to oil and gas leases, mineral severances, interests, and royalty rights, water, water rights or riparian rights, maintenance charges, together with any Lien securing the maintenance charges, zoning laws, ordinances of municipal or other governmental agencies or authorities, and conditions and covenants, if any, applicable to and enforceable against the property described above and as shown by the records of the county clerk of Dallas County.

**Construction:** Words of any gender used in this Deed shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. If this Deed is executed by or to a corporation or trustee the words "heirs, executors, and administrators" or "heirs and assigns" shall, with respect to the corporation or trustee, be construed to mean "successors and assigns."

Signed on May 13, 2011

*Shelley Ortolani*

<u>Substitute Trustee</u>

State of Texas
County of Dallas
This instrument was acknowledged before me on May 13, 2011 by Shelley Ortolani
in his or her capacity as a Substitute Trustee.

*Ashley Mattox*

<u>Notary Public, State of Texas</u>

ASHLEY MATTOX
Notary Public, State of Texas
My Commission Expires
November 17, 2012

 **Compass Bancshares**

NEWS RELEASE

Compass Bancshares, Inc.
P.O. Box 10566
Birmingham, Alabama 35296

<u>For Immediate Release</u>
February 16, 2007
For Further Information: Ed Bilek, Investor Relations    205/297-3331
Web Site: *www.compassbank.com*

## COMPASS BANCSHARES TO BE ACQUIRED BY BANCO BILBAO VIZCAYA ARGENTARIA, S.A.

*$9.6 Billion Transaction Provides Compelling Value for Compass Shareholders*

*Combination Creates a Full-Service and Commercial Banking Leader in Texas and a Southwestern Powerhouse Well-Positioned for Continued Success Across the High-Growth Sunbelt*

Compass Bancshares, Inc. (NASDAQ: CBSS) today announced the signing of a definitive agreement under which Banco Bilbao Vizcaya Argentaria, S.A. (NYSE: BBV Madrid: BBVA) ("BBVA") will acquire Compass for a combination of cash and stock. Compass stockholders can elect to receive either 2.8 BBVA American Depository Shares ("ADSs") or $71.82 in cash per Compass common share, subject to proration. The receipt of BBVA ADSs in the transaction, which will comprise just over half the consideration, will be tax free to Compass stockholders. Based on BBVA's closing stock price on Thursday, February 15, 2007, the transaction has an aggregate value of approximately $9.6 billion. This represents a premium of 16.25 percent over the closing price of Compass' common stock on Wednesday, February 14, 2007.

BBVA, which operates in 35 countries, is based in Spain and has substantial banking interests in the Americas. The transaction will facilitate BBVA's continued growth in Texas and will create the largest regional bank across the Sunbelt. Upon completion of the transaction, Compass will rank among the top 25 banks in the United States with approximately $47 billion in total assets, $32 billion in total loans and $33 billion in total deposits. In addition, the combined company will rank fourth in deposit market share in Texas with $19.6 billion in total deposits and 326 full-service banking offices.

Compass is a $34 billion Southwestern financial holding company that operates 415 full-service banking centers in Alabama, Arizona, Colorado, Florida, New Mexico and Texas. Compass provides a broad array of products and services through three primary lines of business – Corporate Banking, Retail Banking and Wealth Management. Compass is among the top 30 U.S. bank holding companies by asset size and ranks among the top earners of its size based on return on equity.


PLAINTIFF'S EXHIBIT
6

Compass and BBVA – A Southwestern Powerhouse
Page 2

"This transaction compares extremely well to comparable transactions and provides outstanding value for our shareholders. Moreover, the transaction allows them to participate in the upside potential of this compelling combination," said D. Paul Jones, Jr., Compass' chairman and chief executive officer. "We expect significant benefits for our customers and clients and look forward to working with BBVA to facilitate the continued growth of Compass, particularly in the Southwestern United States. We are also pleased that our employees will enjoy new opportunities as part of a larger, global financial services company."

"The performance of Compass over the last several years and the meaningful value we have created for our shareholders demonstrate the success of our strategy. As part of BBVA, we will have the benefits of greater scale, scope and financial resources to continue building on this success," stated Jones.

"Under the leadership of Paul Jones and his experienced senior management team, Compass has built a strong and highly profitable franchise that is well-positioned for continued growth. We are pleased to have Paul and his management team bringing their talents to bear on the management of our combined U.S. franchise," said Francisco Gonzalez, chairman and chief executive officer of BBVA. "With one of the most respected bank management teams in the U.S. and as a highly complementary addition to BBVA's rapidly growing presence in the Americas, we expect that Compass will be a strong contributor to the long-term growth and success of BBVA. We are confident that by combining Compass with our banking operations in Texas, we can leverage the resources of BBVA to provide greater value for the shareholders of both companies."

Under the terms of the definitive agreement, which has been approved by the board of directors of Compass and the relevant bodies of BBVA, Compass will become a wholly-owned subsidiary of BBVA. After closing, BBVA intends to merge its U.S. based banking affiliates – including the former operations of Texas Regional Bancshares, State National Bancshares and Laredo National Bancshares – with Compass.

The aggregate consideration is composed of a fixed number of approximately 196 million shares of BBVA common stock and approximately $4.6 billion in cash. The merger is subject to customary closing conditions, including necessary bank regulatory approvals in the U.S. and Spain and the approval of the stockholders of both Compass and BBVA. The transaction is expected to close in the second half of 2007.

Sandler O'Neill + Partners, L.P. acted as financial adviser to Compass and Balch & Bingham LLP and Wachtell, Lipton, Rosen & Katz acted as its legal advisers. Morgan Stanley acted as financial adviser to BBVA and Cleary Gottlieb Steen & Hamilton LLP acted as its legal adviser.

Compass and BBVA – A Southwestern Powerhouse
Page 3

## Transaction Multiples

| | Compass Basis / Current Value | Transaction |
|---|---|---|
| Price Per Share | | $71.82 |
| Aggregate Deal Value ($billion) | | $9.6 |
| Price / 2006 EPS | $3.53 | 20.3x |
| Price / Estimated '07 EPS | | |
| Mean | $3.78 | 19.0x |
| Median | $3.80 | 18.9x |
| Price / BV | $21.71 | 331% |
| Price / TBV | $16.08 | 447% |
| Core Deposit Premium | 31.2% | 39.5% |
| Premium to Market (2/14/07) | $61.78 | 16.3% |

**Conference Call Information**

Compass will hold a conference call at 11:00 a.m. Central Time today regarding the transaction. For telephone access, dial 1-888-543-2107 in North America and 1-706-634-7214 for International participants. Telephone participants are requested to dial in 10 minutes prior to the start of the call to allow time for all participants to log in. Internet access to the call and to the supporting slide presentation will be available through Compass' web site at www.compassbank.com. Click on the link labeled "Compass Bancshares Conference Call" to access the webcast and slide presentation.

A replay of the conference call will be available through Compass' web site and by telephone at 1-800-642-1687 in North America and 1-706-645-9291 for International (conference ID 9521540) until midnight on February 23, 2007.

**About Compass**

Compass Bancshares, Inc. is a $34.2 billion Southwestern financial holding company which operates 415 full-service banking offices including 162 in Texas, 89 in Alabama, 74 in Arizona, 44 in Florida, 33 in Colorado and 10 in New Mexico. Compass is among the top 30 U.S. bank holding companies by asset size and ranks among the top earners of its size based on return on equity. Shares of Compass' common stock are traded through the NASDAQ Global Select Market[SM] exchange under the symbol CBSS. Additional information about Compass, a member of the S&P 500 Index and Dow Jones Select Dividend Index, can be found at www.compassbank.com.

Compass and BBVA – A Southwestern Powerhouse
Page 4

## About Banco Bilbao Vizcaya Argentaria, S.A.

Banco Bilbao Vizcaya Argentaria, S.A. is a financial group with more than $520 billion in total assets, 35 million clients, 7,500 branches and approximately 100,000 employees in 35 countries. The BBVA Group maintains a leadership position in Spain, Mexico, Latin America and has started a growth and diversification strategy in the U.S. and Asia.

### Cautionary Statement Regarding Forward-Looking Information

Information set forth in this release contains forward-looking statements, which involve a number of risks and uncertainties. Compass cautions readers that any forward-looking information is not a guarantee of future performance and that actual results could differ materially from those contained in the forward-looking information. Such forward-looking statements include, but are not limited to, statements about the benefits of the business combination transaction involving Compass and BBVA, including future financial and operating results, the new company's plans, objectives, expectations and intentions and other statements that are not historical facts.

The following factors, among others, could cause actual results to differ from those set forth in the forward-looking statements: the ability to obtain regulatory approvals of the transaction on the proposed terms and schedule; the failure of Compass stockholders or BBVA shareholders to approve the transaction; the risk that the businesses will not be integrated successfully; the risk that the cost savings and any other synergies from the transaction may not be fully realized or may take longer to realize than expected; disruption from the transaction making it more difficult to maintain relationships with customers, employees or suppliers; competition and its effect on pricing, spending, third-party relationships and revenues. Additional factors that may affect future results are contained in Compass' and BBVA's filings with the SEC, which are available at the SEC's web site http://www.sec.gov. Compass disclaims any obligation to update and revise statements contained in these materials based on new information or otherwise.

### Additional Information About This Transaction

In connection with the proposed transaction, BBVA will file with the Securities and Exchange Commission (the "SEC") a Registration Statement on Form F-4 that will include a proxy statement of Compass that also constitutes a prospectus of BBVA. Compass will mail the proxy statement/prospectus to its stockholders. Investors and security holders are urged to read the proxy statement/prospectus regarding the proposed transaction when it becomes available because it will contain important information. You may obtain a free copy of the proxy statement/prospectus (when available) and other related documents filed by Compass and BBVA with the SEC at the SEC's website at www.sec.gov. The proxy statement/prospectus (when it is available) and the other documents may also be obtained for free by accessing Compass' website at www.compassbank.com under the tab "Investor Relations" and then under the heading "SEC Filings".

### Participants in this Transaction

Compass, BBVA and their respective directors, executive officers and certain other members of management and employees may be soliciting proxies from stockholders in favor of the transaction. Information regarding the persons who may, under the rules of the SEC, be considered participants in the solicitation of the stockholders in connection with the proposed transaction will be set forth in the proxy statement/prospectus when it is filed with the SEC. You can find information about Compass' executive officers and directors in Compass' definitive proxy statement filed with the SEC on March 17, 2006. You can find information about BBVA's executive officers and directors in BBVA's Form 20-F filed with the SEC on July 7, 2006. You can obtain free copies of these documents from Compass or BBVA using the contact information above.

TRANSACTION AGREEMENT

TRANSACTION AGREEMENT (this "Agreement"), dated as of February 16, 2007, by and among BANCO BILBAO VIZCAYA ARGENTARIA, S.A., a bank organized and existing under the Laws of Spain (" Parent "), and COMPASS BANCSHARES, INC., a Delaware corporation (the " Company ").

W I T N E S S E T H :

WHEREAS, promptly following the execution of this Agreement, Parent shall form a new wholly owned subsidiary ("Parent Texas Sub ") as a Texas corporation under and in accordance with the Texas Business Corporation Act (the " TBCA "), and Parent shall cause Parent Texas Sub to, and Parent Texas Sub shall, sign a joinder agreement to this Agreement and be bound hereunder;

WHEREAS, promptly following the execution of this Agreement, the Company shall form a new wholly owned subsidiary (" Company Virginia Sub ") as a Virginia corporation under and in accordance with the Virginia Stock Corporation Act (the " VSCA "), and the Company shall cause Company Virginia Sub to, and Company Virginia Sub shall, sign a joinder agreement to this Agreement and be bound hereunder;

WHEREAS, the Boards of Directors of each of Parent (the "Parent Board") and the Company (the "Company Board") have approved, and the Boards of Directors of each of Parent Texas Sub (the " Parent Texas Sub Board ") and Company Virginia Sub (the " Company Virginia Sub Board ") shall approve, the strategic business combination transactions provided for herein (the " Transaction ") whereby (1) the Company will merge with and into Company Virginia Sub, with Company Virginia Sub surviving such merger (the " Reincorporation Merger "), (2) immediately following the Reincorporation Merger, Company Virginia Sub, as the surviving corporation in the Reincorporation Merger, will become a wholly owned subsidiary of Parent pursuant to a statutory share exchange (the " Share Exchange ") in accordance with VSCA and (3) immediately following the Share Exchange, Company Virginia Sub will merge with and into Parent Texas Sub (the " Third Step Merger "), with Parent Texas Sub as the surviving corporation in such Third Step Merger;

WHEREAS, concurrently with the execution of this Agreement, certain of the senior executives of the Company are entering into employment agreements with Parent and the Company, which employment agreements shall become effective as of the Exchange Effective Time (as defined below);

WHEREAS, it is the intent of the parties hereto that, for U.S. federal income tax purposes, the Reincorporation Merger shall constitute a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the " Code "), and that this Agreement shall constitute a "plan of reorganization" in respect of the Reincorporation Merger for the purposes of Sections 354 and 361 of the Code;

WHEREAS, it is the intent of the parties hereto that, for U.S. federal income tax purposes, the Share Exchange and the Third Step Merger shall be treated as a single, integrated



PLAINTIFF'S EXHIBIT

transaction that constitutes a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement shall constitute a "plan of reorganization" in respect of such transaction for the purposes of Sections 354 and 361 of the Code;

WHEREAS, for U.S. federal income tax purposes, it is intended that the Share Exchange and the Third Step Merger result in no gain recognition to the shareholders of Company Virginia Sub pursuant to Section 367(a) of the Code;

WHEREAS, the parties desire to make certain representations, warranties and agreements in connection with the Transaction and also to prescribe certain conditions to the Transaction.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

ARTICLE I

THE REINCORPORATION MERGER

1.1 The Reincorporation Merger. Subject to the terms and conditions of this Agreement, in accordance with the General Corporation Law of Delaware (the "DGCL") and the VSCA, at the Reincorporation Effective Time, the Company shall merge with and into Company Virginia Sub. Company Virginia Sub shall be the surviving corporation (the "Surviving Corporation") in the Reincorporation Merger and shall continue its corporate existence under the laws of the Commonwealth of Virginia. Upon consummation of the Reincorporation Merger, the separate corporate existence of the Company shall terminate.

1.2 Reincorporation Effective Time. The Reincorporation Merger shall become effective in accordance with a Plan of Merger (which Plan of Merger shall be prepared by Company promptly following the date of this Agreement and shall be consistent with this Agreement and the VSCA and reasonably satisfactory to Parent) on the Closing Date (as defined in Section 11.1) at the time that is specified in the certificate of merger relating to the Reincorporation Merger issued by the Virginia State Corporation Commission and upon the issuance of the certificate of merger by the Secretary of State of the State of Delaware (the "Reincorporation Effective Time").

1.3 Effects of the Reincorporation Merger. At and after the Reincorporation Effective Time, the Reincorporation Merger shall have the effects set forth in the DGCL and the VSCA.

1.4 Conversion of Shares.

(a) At the Reincorporation Effective Time, by virtue of the Reincorporation Merger and without any action on the part of the Company, Company Virginia Sub or any holder of common stock, par value $2.00 per share, of the Company (the "Company Common Stock"), (i) each share of Company Common Stock (including restricted shares of Company Common Stock ("Company Restricted Stock")) issued and outstanding immediately prior to the Reincorporation Effective Time (other than shares held in treasury) shall be converted into one

2

it with respect to such Company Virginia Sub Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Company Virginia Sub Certificate the Consideration deliverable in respect thereof pursuant to this Agreement.

(i) Notwithstanding anything in this Agreement to the contrary, if Parent so elects prior to the Exchange Effective Time, the Exchange Agent shall aggregate all fractional interests in Parent Ordinary Shares and sell all such shares, in one or more transactions executed on the NYSE through one or more brokers nominated by Parent with the proceeds of such shares being remitted to the Exchange Agent as soon as practicable thereafter. The Exchange Agent shall deliver the cash proceeds of any such sales to former holders of shares of Company Virginia Sub Common Stock in lieu of their fractional interest in Parent Ordinary Shares or Parent ADSs. The proceeds to any holder of shares of Company Virginia Common Stock sold by the Exchange Agent pursuant to this Section 3.3(i) shall be the proceeds before any costs associated with any such sale, and any costs incurred in connection with any such sale (including any commissions, transfer taxes and other transaction costs) shall be borne by Parent.

## ARTICLE IV

## THE THIRD STEP MERGER

4.1 The Third Step Merger. Subject to the terms and conditions of this Agreement, in accordance with the VSCA and Texas Business Organizations Code (the " TBOC "), as promptly as possible following the Exchange Effective Time and the time that the Transfer Agent, for the benefit of Parent, receives the Company Virginia Exchange Certificate and at the Third Step Merger Effective Time, Company Virginia Sub shall merge with and into Parent Texas Sub. Parent Texas Sub shall be the surviving corporation (the " Final Surviving Corporation ") in the Third Step Merger and shall continue its corporate existence under the laws of the state of Texas. Upon consummation of the Third Step Merger, the separate corporate existence of Company Virginia Sub shall terminate.

4.2 Third Step Merger Effective Time. The Third Step Merger shall become effective when the articles of merger relating to the Third Step Merger (the " Articles of Merger ") are filed in the office of the Secretary of State of the State of Texas pursuant to Article 5.05 of the TBOC and at the time that is specified in the certificate of merger relating to the Third Step Merger issued by the Virginia State Corporation Commission (the " Third Step Merger Effective Time ").

4.3 Effects of the Third Step Merger. At and after the Third Step Merger Effective Time, the Third Step Merger shall have the effects set forth in the VSCA and the TBOC.

4.4 Conversion of Shares.

(a) At the Third Step Merger Effective Time, by virtue of the Third Step Merger and without any action on the part of the Parent, Parent Texas Sub, Company Virginia Sub or any holder of Company Virginia Sub Common Stock, (i) each share of Company Virginia Sub Common Stock issued and outstanding immediately prior to the Third Step Merger Effective Time shall be converted into one share of common stock, par value $0.01 per share, of Parent Texas Sub (the " Parent Texas Sub Common Stock "), (ii) each share of Company Virginia Sub Common Stock held in the treasury of the Company Virginia Sub immediately prior to the Third

15

Step Merger Effective Time shall be cancelled and (iii) each share of Parent Texas Sub Common Stock issued and outstanding immediately prior to the Third Step Merger Effective Time shall remain outstanding.

(b) Each certificate previously representing any shares of Company Virginia Sub Common Stock shall, following the Third Step Merger Effective Time, represent, without the requirement of any exchange thereof, that number of shares of Parent Texas Sub Common Stock into which such shares of Company Virginia Sub Common Stock have been converted pursuant to Section 4.4(a) .

4.5 Certificate of Formation. Subject to the terms and conditions of this Agreement, at the Third Step Merger Effective Time, the certificate of formation of Parent Texas Sub in effect immediately prior to the Third Step Merger shall be the certificate of formation of the Final Surviving Corporation until thereafter amended in accordance with applicable law as in effect immediately prior to the Third Step Merger Effective Time with such changes as are (a) required by the TBOC, (b) otherwise as proposed by Parent and (c) necessary to change the name of Parent Texas Sub to "Compass Bancshares, Inc. " ; subject, however, in each case to the provisions of Section 8.7 hereof .

4.6 Bylaws. Subject to the terms and conditions of this Agreement, at the Third Step Merger Effective Time, the bylaws of Parent Texas Sub in effect immediately prior to the Third Step Merger shall be the bylaws of the Final Surviving Corporation until thereafter amended in accordance with applicable law as in effect immediately prior to the Third Step Merger Effective Time with such changes as are (a) required by the TBOC and (b) otherwise as proposed by Parent; subject, however, in each case to the provisions of Section 8.7 hereof.

4.7 Tax Consequences. It is intended that, for U.S. federal income tax purposes, the Share Exchange and the Third Step Merger shall be treated as a single, integrated transaction that constitutes a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement shall constitute a "plan of reorganization" in respect of such transaction for the purposes of Sections 354 and 361 of the Code.

4.8 Board of Directors; Management. The directors and officers of Parent Texas Sub immediately prior to the Third Step Merger Effective Time shall be the directors and officers of the Final Surviving Corporation, each to hold office in accordance with the certificate of formation of the Final Surviving Corporation until their respective successors are duly elected or appointed and qualified.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Subject to Section 11.2 and except as disclosed in the disclosure schedule (the "Company Disclosure Schedule") delivered by the Company to Parent prior to the execution of this Agreement (which schedule sets forth, among other things, items, the disclosure of which is necessary or appropriate, either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in this Article V, or to one or more of the Company's covenants, provided, however, that disclosure in

16



# FINAL NOTICE

## OFFICE OF CONSTABLE
## BEN ADAMCIK
## PRECINCT NO. 3, DALLAS COUNTY

## 24 HOUR NOTICE TO VACATE
## FINAL NOTICE

A COURT ORDER, CASE NO. **CC-11-04352 B** HAS BEEN
ISSUED ORDERING YOUR IMMEDIATE EVICTION FROM THIS PROPERTY.

THIS
NOTICE WAS POSTED ON **Oct 6** 2011 AT **4:57** PM

@ **4115 LA PLACE**

***NOTE - A MOVING CREW WILL BE HERE IN 24 HOURS OR ANY TIME THEREAFTER,
AND ALL REMAINING POSSESSIONS WILL BE REMOVED FROM THE PREMISES AND
PLACED ON THE CURB***

ATENCION - LA CORTE HA EXPEDIDO ORDEN # **CC1104352B**
ORDENADO LA INMEDIATA DESALOJACION DE ESTA PROPIEDAD, FUE PUESTO EN
**Oct 6** 2011 @ **4:57 PM**
EN 24 HORS O CULQUIER TIEMPO DESPUES DE LA FECHA Y HORA INDICADA SE
PROCEDERA A REMOVER TODAS SUS PERTENENCIAS Y EFECTOS Y PUESTOS EN LA
BANQUETA

@ **4115 LA PLACE**

CONSTABLE PCT. #3
BEN ADAMCIK
DALLAS COUNTY, TEXAS

DEPUTY / AGENTE

1411 W. Beltline Road, Ste. 100
Richardson, Texas 75080
972-690-5692

PLAINTIFF'S
EXHIBIT
I



## Stevenson & Ricker

*Attorneys At Law, A Partnership of Professional Corporations*
One Castle Hills Building
1100 NW Loop 410, Suite 260
San Antonio, Texas 78213
Voice (210) 690-9944 ♦ Fax (210) 690-3635 ♦ Email: leestevenson@att.net

Wednesday, May 18, 2011

James Dudley Judd Jr. aka James Judd & James W. Morris
And All Other Occupants or Tenants
4115 La Place Dr.
Dallas, TX 75220

### NOTICE TO VACATE

Regarding the following Promissory Note and Deed of Trust:

| | |
|---|---|
| Loan Number: | xxx5766000071448 |
| Maker: | James Dudley Judd Jr. aka James Judd & James W. Morris |
| Property Address | 4115 La Place Dr. |
| | Dallas, TX 75220 |

Dear James Dudley Judd Jr. aka James Judd & James W. Morris And All Other Occupants or Tenants:

### Representation

Please be advised that we represent Compass Bank. Compass Bank has been acquired by Banco Bilbao Vizaya Argentaria (BBVA and is now a part of the BBVA family of banks.

We have been retained to act on Compass Bank's behalf to collect a debt. This firm is acting in the capacity of a debt collector attempting to collect a debt. This letter is an attempt to collect a debt and any information obtained by the firm will be used for that purpose. We are relying upon the information given to us by the lender. This letter provides formal notice of the following:

**IF YOU ARE A TENANT OF THIS PROPERTY, PLEASE SEE THE ADDITIONAL NOTICE ATTACHED TO THIS LETTER ENTITLED "NOTICE TO ANY TENANTS OF 4115 La Place Dr., Dallas, TX 75220.**

### Notice of the Foreclosure Sale

Please be advised that on Tuesday, May 3, 2011 the property to which this letter has been addressed to has been sold by the Substitute Trustee per the terms of a Deed of Trust. The property was sold to Compass Bank as the highest bidder for the consideration stated in the Substitute Trustee's Deed.

PLAINTIFF'S
EXHIBIT
J

## Effect of the Foreclosure Sale

Please be advised that as of the date of the Foreclosure Sale, title to the property has been divested from you and is now held by Compass Bank.

## Notice to Vacate the Property

Due to the foreclosure sale you are no longer entitled to occupy the property. We have been advised that the above identified Property is occupied. We have been requested to begin appropriate legal actions to obtain possession of the Property for the new owner as quickly as possible. This letter formally notifies you and makes a demand on you to move ("vacate") from the property. Compass Bank is taking immediate possession of the property. Compass Bank is commencing the first step of an eviction proceeding by giving you the following notice:

**IF YOUR NAME APPEARS AS THE ADDRESSEE OF THIS LETTER, THEN IT IS ALLEGED THAT YOU ARE OR MAY BE A TENANT AT SUFFERANCE OR IF YOUR NAME DOES NOT APPEAR AS AN ADDRESSEE OF THIS LETTER BUT YOU ARE A MEMBER OF THE NAMED ADDRESSEE'S FAMILY NOT PAYING RENT, THEN YOU MUST VACATE THE PREMISES ON OR BEFORE THE EXPIRATION OF SEVEN (7) DAYS FROM THE DATE OF DELIVERY OF THIS LETTER. THIS LETTER IS AN OFFICIAL, FORMAL WRITTEN DEMAND THAT YOU MUST VACATE THE PROPERTY KNOWN AS: 4115 LA PLACE DR., DALLAS, TX 75220.**

Please be advised each and every person occupying the premises is notified that if the terms of this letter are not followed, an action in forcible detainer may be commenced. In such action, we will seek a judgment for possession of the property, and costs of suit. Further, if the premises are not vacated before the 11th day after the date of receipt of this notice we may also seek attorney's fees and reasonable rent.

If you are occupying the property per a lease and you have timely paid the rent and are not otherwise in default under the lease, this letter constitutes formal and final demand that you vacate the property within 90 days from the date this letter is delivered or attempted delivery or the time period allowed by applicable state or federal law. If you have a written lease you are requested to provide a copy of the lease to me at the above address within 10 days of this letter.

Unless you provide to us sufficient proof that you paid your rent for the month that the foreclosure sale was held in, Tuesday, May 3, 2011, we will presume that you did not do so and we will expect you to vacate the property within 7 days as demanded above.

No further request to vacate will be given to you prior to the filing of a forcible detainer action against you.

## Instructions For Vacating The Property

 

## NOTICE TO ANY TENANTS OF 4115 La Place Dr.
## Dallas, TX 75220

Compass Bank is now the owner of 4115 La Place Dr., Dallas, TX 75220 (the "Property") pursuant to a foreclosure sale conducted on Tuesday, May 3, 2011. As the new owner of the Property, Compass Bank may have the right to terminate your lease. Compass Bank is willing to work with you to find an adequate amount of time for you to move out of the Property. To that end, please contact this firm at the address or telephone number listed below.

You are hereby notified that under the Helping Families Save Their Homes Act of 2009, Title VII Section 702, you may have up to 90 days to vacate the premises.

Additionally, if you are a tenant under a bona fide lease or tenancy, **YOU MUST PROVIDE THIS FIRM WITH YOUR LEASE AND PROOF OF PAYMENT** if you (1) are on the Property as a tenant under a lease agreement; and you (2) have paid timely rent for the month of the foreclosure sale, and any subsequent months; and (3) you are not otherwise in default under the lease agreement

If it is determined that you are a tenant pursuant to a bona fide lease or tenancy, you are hereby notified that you will have until the end of your lease period to vacate the premises.

Please send any documents that would establish your lease and timely payment of rent to:

Compass Bank
C/O STEVENSON & RICKER
Attorneys At Law, A Partnership of Professional Corporations
One Castle Hills Building
1100 NW Loop 410, Suite 260
San Antonio, Texas 78213

The contact for the bank is:     Sharonda Sails
                                       Special Assets Department
                                       Real Estate Market, Analyst II
                                       Group BBVA Compass Bank
                                       401 West Valley Avenue
                                       Homewood Alabama 35209
                                       Phone (205) 238-2255 • Fax (205) 297-2658

Our contact information is:     Voice (210) 690-9944 • Fax (210) 690-3635
                                       Email:leestevenson@att.net

                                       Sincerely,

                                       S. Lee Stevenson, Jr.

# ASSET-BACKED ALERT

The Weekly Update on Worldwide Securitization

www.ABAlert.com

## APRIL 30, 2004

2  Manager Formulates CDO Program

2  US Bond Insurer Eyes European Swaps

3  Wachovia Backs Reinsurance Venture

3  Morgan Stanley's Bajaj Joins CSFB

3  Risk Manager's Business Picking Up

3  ASF Adjusts Staff Responsibilities

8  More Cardholders Paying Their Bills

9  UK Lender to Make CMBS Debut

4  CALENDAR

## THE GRAPEVINE

The **SEC** will release its proposed disclosure rules for issuers of asset-backed securities within the next week. Officials at the agency voted unanimously on Wednesday to publish the 400-page document, which would formalize a number of practices that are already followed by most issuers. As expected, the rules would also make it easier for investors to learn about the assets and lenders supporting new securitizations, according to a report by **Mark Adelson**, **Nomura's** head asset-backed researcher. The **American Securitization Forum** and the **American Bar Association** are arranging separate responses. Comments are due to the SEC within 60 days.

New York asset manager **Vertical Capital** is preparing a hedge fund that will invest exclusively in asset-backed securities, mortgage-backed bonds and collateralized debt obligations. There's no word on how much capital it's seeking for the venture. The firm is looking to

See GRAPEVINE on Back Page

## Parmalat Scandal Awakens Regulatory Giant

**Citibank** may have inadvertently prompted the **SEC** to examine how commercial-paper conduit operators structure their vehicles.

The regulator appears to be following through with threats it made months ago to take a closer look at the maneuvers that allow many banks to comply with new accounting rules for conduits. At issue are questions concerning Citi's extraction of some $200 million of trade receivables from its **Eureka Funding** conduit just as the originator, **Parmalat**, ran into trouble last November — rather than letting the vehicle's equity holders absorb any losses.

The market began buzzing about the stepped-up SEC scrutiny last week, when an internal memorandum from the **American Bankers Association** started circulating among industry players. The alert — dashed off by senior accounting advisor **Gwen Ritter** — said the SEC is specifically targeting conduit equity

See PARMALAT on Page 4

## Radian Removes Securitization Executive

Bond insurer **Radian Asset Assurance** has let its global structured-products chief go in an apparent dispute over the company's business strategy.

**Ned Bowers** had been trying to convince Radian's upper brass to start buying stakes in companies that trade and invest in credit derivatives, which essentially act as insurance against losses among other financial products. But his bosses wanted to remain focused on wrapping asset-backed securities, mortgage-backed bonds and collateralized debt obligations, as well as insuring swap counterparties against the risk they incur.

Bowers left Radian on April 23. His whereabouts are unknown.

Four of Radian's existing structured-finance specialists are assuming Bowers' duties. They are: credit-derivatives head **Hao Wu**; asset-backed chief **Anna Laudon**; portfolio management and research head **Paul Larsen**; and European

See RADIAN on Page 2

## Alabama Lender Weighs Issuance Options

A bank in Birmingham, Ala., wants to securitize a portion of its $19 billion book of loans.

**Compass Bank** is in the early stages of planning the program, and hasn't yet decided whether to target its home-equity loans and lines of credit, auto loans or commercial mortgages — although it's leaning toward securitizing its home-equity credits first. It hopes to kick off the program within a few months.

Any securitization of home-equity credits would employ a shelf entity called Compass Asset Acceptance that the bank filed with the **SEC** in the summer of 2002, but never used. Compass holds $3 billion of home-equity loans and lines.

The bank is also looking at its $3.1 billion portfolio of auto loans, most of which were written though partnerships with dealerships. The bank securitized its auto loans once before, in a $401 million issue completed in June 1998.

Also under consideration are the bank's $4 billion of mortgages on apartment, office, retail and industrial properties. As part of the plan, Compass has

See ALABAMA on Page 9



PLAINTIFF'S
EXHIBIT
K

## Manager Formulates CDO Program

An Oak Brook, Ill., money manager with $7 billion of assets is seeking to become an issuer of collateralized debt obligations.

**McDonnell Investment Management** is aiming to complete its first deal in the fourth quarter. The fixed-income shop hasn't decided on the size of the arbitrage transaction, which would be backed by senior-secured loans to junk-rated corporations.

The collateral pools for McDonnell's future transactions could also include some corporate junk bonds, depending on market conditions. The firm is talking to potential underwriters.

McDonnell's CDO program will be run by managing directors **Brian Good** and **James Fellows**, who joined the firm this week as co-heads of the newly formed alternative credit strategies group. **Robert Hickey**, another recently hired managing director, is acting as the unit's senior portfolio manager. McDonnell is also seeking to hire four analysts, a trader and an operations specialist to work under Good, Fellows and Hickey.

Good and Fellows had worked at **Columbia Management**, which **Bank of America** acquired in its recent takeover of **FleetBoston Financial** and sold earlier this month to **Highland Capital Management**. At Columbia, they founded and ran a loan-management team that managed closed-end funds and

issued CDOs, often under the name of former Columbia unit **Stein Roe & Farnham**. Highland had been hoping they would continue in that role. Hickey was a senior portfolio manager in the mutual fund unit of Denver-based **Invesco Funds**.

In addition to its CDO program, McDonnell's alternative credit strategies group could set up closed-end mutual funds that would invest in junk-rated corporate bonds or loans. ❖

## US Bond Insurer Eyes European Swaps

A New York-based bond insurer is poised to expand its European business.

**Radian Asset Assurance** is a few weeks away from obtaining licensing from the U.K. **Financial Services Authority** to start insuring companies against the risk they incur through credit-derivative transactions tied to asset-backed securities, mortgage-backed bonds and collateralized debt obligations.

The company eventually expects its European operation to mirror its U.S. business, 60% of which comes from credit-derivative issues. Swap counterparties generally prefer to do business with licensed insurers for regulatory-capital reasons.

To help boost its credit-derivatives business in the U.S. and Europe, Radian plans to start assisting in the selection of collateral for transactions. It will also help structure deals to allow for the removal of poorly performing assets and the replacement of underperforming managers.

Double-A-rated Radian is already licensed in the U.K. and other European jurisdictions to wrap traditional structured products. It also intends to start writing policies that will offer a second layer of protection on deals wrapped by other insurers.

Radian Asset Assurance is the bond-insurance arm of Radian Group (see story on Page 1). ❖

## Radian ... From Page 1

group head **Andrew Reid**.

Bowers joined Radian in the fall of 2001, shortly after the company bought out **Enhance Financial**. He is credited with developing Radian's bond-insurance business and hiring much of its staff.

Radian Asset Assurance is the bond-insurance arm of Radian Group. A sister company called Radian Re reinsures policies for other bond insurers. Two other affiliates, Radian Insurance and Radian Guaranty, act as mortgage insurers. ❖

## PRICINGS POSTED ONLINE

Pricing details for the following issues can be accessed at ABAlert.com:
- SLM Student Loan Trust, 2004-4 ($2.5 billion).
- CarMax Auto Owner Trust, 2004-1 ($600 million).

CORPORATE FINANCE • COLLATERALIZED MARKETS • STRUCTURED FINANCE

**lending**

**strength**

Over $4 Billion in Commitments Issued

CapitalSource    Contact:
Michael Szwajkowski at 301 841 2742, mcs@capitalsource.com
Jeffrey Galle at 301 841 2717, jgalle@capitalsource.com
or visit www.capitalsource.com

# Wachovia Backs Reinsurance Venture

**Wachovia** is setting up a reinsurance company that will target policies written by the securitization market's largest bond insurers.

The Charlotte bank has placed structured-finance specialists **Daniel Farrell, David Schiff** and **John McEvoy** in charge of the Bermuda operation, called **BluePoint Re.** It has also pledged $300 million of equity and reserve capital to the outfit, which is about to begin doing business.

BluePoint would be able to reinsure billions of dollars of bond policies with the money it is receiving from Wachovia, although its exact capacity remains unclear. The company plans to establish long-term contracts to reinsure policies for **Ambac, MBIA, FSA** and **FGIC,** among others. It hopes to receive ratings of at least double-A.

Wachovia initially sought other equity partners for the venture, but decided to go it alone when it was unable to find any takers. One prospective investor said he didn't like the fact that the large sums of reserve capital needed by reinsurers generally mean those companies are slow to produce returns for their equity holders.

Farrell, BluePoint's president, previously worked as North American securitization chief at **FSA.** He left the insurer in November, after 13 years.

Schiff, a managing director, spent the past year as a director in a Wachovia unit that invests in structured-finance companies. Before that, he held several high-level posts in the securitization units of **J.P. Morgan Chase** and the former **Chase Securities.**

McEvoy, BluePoint's chief executive, was the founder of **Creditex,** which operates a credit-derivatives trading platform for its clients. He continues to sit on the company's board of directors.

The trio has been working on BluePoint from a New York office since January. They'll move to Bermuda soon. BluePoint is seeking to hire three more directors to separately work on policies involving global securitized products, municipal bonds and European principal, project and infrastructure finance.

BluePoint is starting up just as some of the field's largest players are expanding their businesses. **Assured Guaranty,** for example, raised $882 million through a stock offering on April 23. And **Ram Re** is planning its own initial public offering. RAM and BluePoint would be the only companies whose entire businesses consist of reinsuring bond policies. ❖

# Morgan Stanley's Bajaj Joins CSFB

Commercial-MBS specialist **Arvind Bajaj** has jumped to **Credit Suisse First Boston's** London office, from **Morgan Stanley.**

Bajaj is now helping First Boston expand its fledgling commercial MBS operation in Europe. He had spent almost 10 years at Morgan Stanley, most recently as an executive director seeking to develop a network of buyers for low-rated bonds.

Bajaj initially joined Morgan Stanley's New York office as a vice president. In 2000, he transferred to London, working on the origination of large loans. Two years later, he switched to the bond-distribution side of the business. Morgan Stanley's plans for replacing him could not be learned.

Bajaj is the second senior securitization executive to leave Morgan Stanley this year. **Ravindra Joseph** quit as European group head in February to join **Goldman Sachs'** financing group, which is headed by **Tim Bunting. Ellen Brunsberg,** previously head of CMBS underwriting in Europe, replaced Joseph. ❖

# Risk Manager's Business Picking Up

Business is booming for a firm that oversees servicers of securitized home loans.

One-year-old **Risk Management Group** of New York expects to be hired by underwriters as credit-risk manager on four deals that are due to price by midyear, president **Charles Cacici** said.

The firm already monitors the loans backing several outstanding issues, including a $482 million securitization of subprime home loans that **Terwin Capital** completed earlier this week.

Risk Management is also gaining popularity with investors who hire it to keep track of the collateral supporting seasoned securitizations, Cacici said. In that capacity, he is currently arranging to receive information due to investors in about 30 deals. The firm has roughly 50 similar mandates in the pipeline, Cacici said. ❖

# ASF Adjusts Staff Responsibilities

The **American Securitization Forum** has shuffled some of the officers who run the organization and set its agenda.

The trade group's executive committee recently moved **Joe Donovan** of **Credit Suisse First Boston** to executive vice president, from treasurer.

Donovan now oversees planning for the group's next winter conference in Arizona.

**Deutsche Bank's Richard D'Albert,** meanwhile, stepped in as treasurer. He's also in charge of managing the securitization forum's budget — a task that used to be assigned to the budget and membership committee under **Brian Clarkson** of **Moody's,** who recently stepped down from his role.

The membership side of Clarkson's former committee is now handled by **Morgan Stanley's Gail McDonnell.**

The securitization forum's executive-committee members also decided to extend their first terms by six months, to June 30, 2005. That will pave the way for future office-holders to finish their terms at midyear, right after the group's annual membership meeting. ❖

## Parmalat ... From Page 1

pieces, known as "expected-loss notes," that banks use to avoid booking the vehicles' assets on their balance sheets.

Under the **Financial Accounting Standards Board's** Financial Interpretation No. 46, many banks that run conduits must now give on-balance-sheet treatment to the underlying assets. The operators of about 25 conduits avoided such consolidation by incorporating tiny first-loss pieces into their vehicles. They included Citi, **Banc of America**, **J.P. Morgan Chase**, **HSBC** and **Mellon Bank**. The SEC is interested in such maneuvers because any consolidated assets would have to be noted in a bank's filings to the agency.

Many of Citi's rivals fear that when the bank removed Parmalat's receivables from Eureka, it sent a message to regulators that expected-loss notes don't work at all. If the SEC comes to that conclusion, it could force Citi, along with other U.S. banks that use the technique, to consolidate their conduits' underlying assets and restate their SEC filings for last year and the first quarter of 2004. "The SEC is concerned that banks are not consolidating what should be consolidated under FIN 46," Ritter wrote.

In addition, banks are anxious to know whether the SEC thinks their conduits' equity pieces are too small. In most cases, the first-loss pieces total less than 0.10% of a conduit's outstandings and deliver returns of 15-30%.

The SEC first took notice of banks' attempts to comply with the FASB guidelines late last year, although it had been involved with formulating the consolidation rules from the start. At the time, SEC officials expressed surprise because few conduit operators had consulted them on the matter, and they warned that they might start approaching banks on their own.

Now word has it that the SEC started calling conduit spon-

sors last week to set up meetings — and that Citi was at the top of its list. No banks or accounting firms have actually admitted to making such appointments, however. "At this point, the SEC is on a fact-finding mission," said one banker who runs a conduit using the expected-loss technique.

**Thomas Irvin**, head of the commercial-paper unit at conduit operator **Liberty Hampshire**, said market players might be spreading false rumors about the SEC's wish to speak with banks about expected-loss notes. "The banks that I've talked to said they don't have any meetings, and I'm involved with all of the banks that have done this," he said.

As of November, Liberty Hampshire had purchased more than $35 million of conduit equity from various banks, including Citi. The Chicago company is now one of the market's largest owners of such instruments.

Citi is in the spotlight because its decision to pull Parmalat's failing receivables from Eureka and absorb the losses on its own occurred just as the Italian dairy company got into trouble for defrauding its investors and creditors. In doing so, Citi protected Eureka's investors from suffering any losses — including its equity holder, which is widely believed to be Liberty Hampshire.

Critics said Citi should have allowed the first-loss piece to be wiped out, because it could look to the SEC like the technique is just a sham that banks use to get around the FASB guidelines. "They didn't really transfer the expected loss to a third party if they pulled it out before the holders of the expected-loss notes got hit," one banker said.

To be fair, however, he said that Citi might be telling the truth when it claims it removed the assets before it knew they were in trouble. Conduit operators frequently yank assets simply because "we get a feeling that something just doesn't seem right," he said. "If you think there might be a problem, you shoot first and ask questions later." ❖

## CALENDAR

### Main Events

| Dates | Event | Location | Sponsor | Information |
|-------|-------|----------|---------|-------------|
| May 16-19 | Structured Finance Seminar | Orlando | S&P | www.standardandpoors.com |
| June 8 | ASF Annual Meeting | New York | ASF | www.americansecuritization.com |
| June 14-17 | Global ABS 2004 | Barcelona | IMN | www.imn.org |

### Events in US

| Dates | Event | Location | Sponsor | Information |
|-------|-------|----------|---------|-------------|
| May 3-4 | Securitization Transactions | New York | SFI | www.atlas-sfi.com |
| May 3-4 | Student Loan Securitization | Washington | SRI | www.srinstitute.com |

### Events Outside US

| Dates | Event | Location | Sponsor | Information |
|-------|-------|----------|---------|-------------|
| May 10-11 | Credit Risk in Derivative Products | Toronto | Fitch | www.ccrtraining.com |

To view the complete conference calendar, visit The Marketplace section of ABAlert.com



**ASSET BACKED NOTES FROM AVIS. GUARANTY FROM FGIC.**

**WE'RE STEERING A NEW COURSE.**

DEAL PROFILE:

$600,000,000  RCFC Funding II LLC, Series 2002-1 Rental Car Asset Backed Notes  Cendant Car Rental Group, the operator and franchisor of the Avis and Budget vehicle rental businesses

At FGIC, we were proud to facilitate this recent transaction for the Cendant Car Rental Group, our first in the rental car financing asset class. As a newly-independent organization, we're building on our unsurpassed financial guaranty to broaden our franchise while expanding our presence in global markets. Complex but successful structured transactions like this one are just the start. With an energized management team, we're focused squarely on working with issuers and investment bankers to get the deal done.

For additional information, please contact: Greg Raab, Senior Managing Director, Commercial Asset-Backed Securities at 212-312-3039 or greg.raab@fgic.com



FGIC
Strength is our bond℠

 GLOBAL ORGANIZERS OF INSTITUTIONAL FINANCE & INVESTMENT CONFERENCES

# THE EIGHTH ANNUAL INVESTOR'S & ISSUER'S SUMMIT ON

# GLOBAL ASSET SECURITISATION

## SPONSORS OF THE GLOBAL

### TITANIUM

 ABN·AMRO

CLIFFORD CHANCE

 LaSalle Bank

 MBIA

### PLATINUM

ALLEN & OVERY

 Banc of America Securities

 BANK ONE

BEAR STEARNS

 BNP PARIBAS

 CDC IXIS

 CIBC World Markets

citigroup

COMMERZBANK

 CREDIT LYONNAIS

 CREDIT SUISSE

 Deloitte Touche Tohmatsu

Deutsche Bank

 NOMURA BANK

FRESHFIELDS BRUCKHAUS DERINGER

 FSA

 JPMorgan

Linklaters

Lovells

 MAYER BROWN ROWE & MAW

 Moody's Investors Service

 RBS

 SG CORPORATE & INVESTMENT BANKING

SIDLEY SIDLEY

STANDARD & POOR'S

 UBS

 WACHOVIA SECURITIES

 WR GRACE

 WestLB

WHITE & CASE

 WILMINGTON TRUST

 XL

# EuroWeek

## STRUCTURED FINANCE INTERNATIONAL

CONFERENCE TOPICS DEVELOPED WITH

## FRANK J. FABOZZI

JUNE 14-17, 2004

HOTEL ARTS

BARCELONA, SPAIN

INFORMATION MANAGEMENT NETWORK

For More Information, Please Visit:

## www.imn.org/a650/abam/

**Email:** mail@imn.org
**Call:** +1-212-768-2800 Ext. 1
**Fax:** +1-212-768-2484

## ABS™ 2004 SUMMIT



# More Cardholders Paying Their Bills

Issuers of credit-card securities seem to be benefiting from the improving economy, as an increasing number of cardholders make their payments on time.

According to a monthly survey by S&P, past-due payments decreased for the second month in a row during the 30-day period ended April 15. In fact, the 30-day delinquency figure of 4.75% — representing a 24 bp improvement from a month earlier — is lower than it has been at any point since January 2001. Meanwhile, 60-day delinquencies tumbled 15 bp, to 3.34% — the lowest point since July 2001. Likewise, 90-day delinquencies fell by 8 bp, to 1.95%, the lowest they have been since September 2002.

The increasing amount of on-time payments translates into bigger returns for issuers, who saw the average excess spreads on their securitized accounts increase by 6 bp, to 7.25%, during the March-April stretch. Those spreads represent an issuer's profits and act as the first layer of protection for bondholders.

The improvements boosted yields on the underlying accounts to 17.82%, from 17.7% in mid-March. They also helped the securitization trusts weather a 3 bp rise in losses, which now stand at 6.98%.



**Credit Card Performance**

Source: S&P

S&P's index measures a number of performance factors for $409 billion of securitized credit-card receivables. A link to the full reports on S&P's past surveys can be found at standardandpoors.com by clicking "Indices" and then "Structured Finance." ❖



Collateralised Debt Obligations Asia 2004

# CDO Asia 2004

10 June 2004
JW Marriott Hotel, Hong Kong
**www.cdoasia.net**

Back by Popular Demand!

"Warren Buffet, the world's greatest stock market investor, described derivatives as "Weapons of Mass Destruction" but who has also made large use of both derivatives and credit. Find out why CDOs and credit derivatives have been the money making tools for the world's largest investors from the experts!"

**Collateralised Debt Obligations Asia 2004 (CDO Asia)** is Asia's most comprehensive and authoritative **information** platform for CDOs in Asia. CDO Asia 2004 will be **more comprehensive in content** with a more sophisticated and in-depth **coverage and debate** of the CDO markets in Asia.

**Conference Themes for CDO Asia 2004:**

- Future state of CDOs in Asia
- Synthetic CDO structures
- ABS CDOs & CDO squared
- Technical evaluation of CDO structures
- Investor vs Fund Manager perspectives
- Alternative CDO structures

**rep:y s:ip** Register today at: www.cdoasia.net
Or call (65) 6725 9806 for more details!
fax to: (65) 6725 9886

Name
Designation
Company
Address

Phone
Fax
Email

Platinum sponsor:

**RESERVE YOUR SEAT TODAY at www.cdoasia.net**

Deutsche Bank  

## UK Lender to Make CMBS Debut

Another U.K. building society is about to enter the commercial-MBS market.

**West Bromwich Building Society** has hired **Citigroup** to underwrite a 250 million British pound ($447 million) offering backed by loans on 203 commercial properties in England and Wales. Retail properties account for 42% of the collateral pool, followed by office (34%), light-industrial (12%), residential (5%) and other (7%) properties.

Building societies are mutually owned companies that write small-balance loans on residential properties, and are required by law to restrict commercial mortgages to a small percentage of their portfolios. Securitizations allow building societies to remove commercial mortgages from their balance sheets, freeing up room for new loans.

The idea took root in June 2002, when former building society **Northern Rock** priced a $723.6 million deal via Citi. **Newcastle Building Society** followed suit later that year with a 212.9 million pound offering. ❖

## Alabama ... From Page 1

been talking to headhunters about bringing in help for structured-finance manager **Richard Hughes**. Among the recruits would be a transaction manager who would also work on Compass' securities-arbitrage conduit, **Sunbelt Funding**. That vehicle had $1.1 billion of outstandings at the end of March.

Sources said Compass' interest in securitization is driven by the cheap funding available in the asset-backed market and the bank's need to move loans off its balance sheet. Late last year the bank experienced a sharp increase in assets on its balance sheet when it quietly cancelled a third-party commercial-paper conduit program that funded its commercial mortgages.

The bank, a subsidiary of Compass Bancshares, has $27.5 billion of assets and operates 376 branches in the South and Southwest.

It has been involved in agency-mortgage securitizations in the past. ❖



Financial Research Associates, LLC Proudly Presents the Inaugural

# Leveraged Buy-Outs

July 26-27, 2004

The Princeton Club
of New York
New York, NY

### Join The Who's Who of the Industry as they Discuss these Incisive Topics:

- Evaluating the Current State of the Market
- Examining the Latest Trends & Sector Returns
- Scrutinizing the Latest Financing Innovations for LBOs
- Big Versus Small Debate: How Can Small or Mid-Sized Funds Remain Competitive?
- Effective Fund Raising Techniques
- Exploring International Opportunities
- Deal Origination: Effectively Creating New Deals
- And Much More…

**And… A Must-Attend Workshop on LBO Terms & Conditions for GPs & LPs**

To Register: Call 800-280-8440 or visit us at www.frallc.com

# YOUR EDGE

## IN THE STRUGGLE FOR SECURITIZATION PROFITS

Every week, Asset-Backed Alert gives you a competitive advantage. You get the first, clear view of upcoming developments in the world-wide markets for ABS, MBS, CDOs and asset-backed commercial paper.

See for yourself. Sign up for a three-issue **FREE** trial subscription and discover how Asset-Backed Alert:



▶ Flags oncoming risks and opportunities in structured finance.

▶ Tips you off to personnel shifts and market maneuvers you're not supposed to know about.

▶ Identifies the field's latest winners and losers in the U.S., Europe, Asia, Canada and Latin America.

☐ **YES!** Start my 3-issue **FREE** trial subscription to **ASSET-BACKED ALERT.** There's absolutely no obligation -- I won't receive an invoice unless I choose to subscribe.

NAME:

COMPANY:

ADDRESS:

CITY/ST/ZIP:

TEL:

E-MAIL:

**Fax** this coupon to: 201-659-4141
To order by **phone**, call 201-659-1700
**Or mail to:** Asset-Backed Alert
5 Marine View Plaza, #301, Hoboken NJ 07030
You can also start your free trial at **ABAlert.com**

**April 30, 2004**

ASSET-BACKED ALERT

11

# MARKET MONITOR

### WORLDWIDE ABS ISSUANCE

2004

2003

| Year-to-date volume ($Bil.) | | |
|---|---|---|
| | 2004 | 2003 |
| US Public | 166.1 | 139.8 |
| US 144A | 15.2 | 20.6 |
| US Private | 0.7 | 0.0 |
| Non-US | 58.5 | 50.5 |
| TOTAL | 240.5 | 210.9 |

### US ABS BREAKDOWN
Year-to-date

Subprime Res. 26%
Home Eq. 29%
Other 34%
Non-U.S. Res. 11%

### NON-US ABS ISSUANCE
Volume in past 15 months ($Bil.)

### COLLATERAL LOCATION ($Bil.)
Past 12 months

| | |
|---|---|
| UK | 98.2 |
| Italy | 20.2 |
| Australia | 32.2 |
| Japan | 10.7 |
| Netherlands | 30.2 |
| Other | 76.9 |

### US ABS ISSUANCE
Volume in past 15 months ($Bil.)

### US NON-AGENCY MBS ISSUANCE
Volume in past 15 months ($Bil.)

### WORLDWIDE CBO ISSUANCE
Volume in past 15 months ($Bil.)

### ASSET-BACKED COMMERCIAL PAPER OUTSTANDING
Since 1/1/00 ($Bil.)



Source: Federal Reserve Board

### 5-YEAR FIXED CARD SPREADS
Last six months (basis points)



### SPREADS ON TRIPLE-A ABS

| | Avg. Life | Current | Spread (bps) Week-Ago | 52-wk avg. |
|---|---|---|---|---|
| Credit card - Fixed rate (vs. Swap) | 2.0 | -1 | -1 | +2.8 |
| | 5.0 | +5 | +5 | +7.6 |
| Credit card - Floating rate (vs. 1 mo Libor) | 2.0 | +2 | +2 | +2.7 |
| | 5.0 | +9 | +9 | +10.2 |
| Auto loan- Tranched (vs. Swap) | 2.0 | +2 | +2 | +5.7 |
| | 3.0 | +5 | +4 | +5.5 |
| Home equity - Fixed-rate/ wrapped (vs. Swap) | 2.0 | +30 | +30 | +40.9 |
| | 5.0 | +68 | +68 | +74.3 |
| Swap spreads (bid/offer midpoint) | 2.0 | +35 | +36 | +29.3 |
| | 5.0 | +46 | +42 | +39.2 |
| | 10.0 | +48 | +43 | +40.0 |

Source: Deutsche Bank

Data points for all charts on this page can be found in the Marketplace section of ABAlert.com